# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2759

DARIUS HOLMES,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF HOFFMAN ESTATES and
OFFICER MATTHEW TEIPEL, Star No. 279,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 05 C 2775—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED JANUARY 18, 2007—DECIDED DECEMBER 26, 2007

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After a jury acquitted plaintiff Darius Holmes of charges that he committed a battery upon police officers Martin Piatek and Matthew Teipel and resisted Teipel's efforts to arrest him, Holmes filed suit against the officers and their municipal employers under 42 U.S.C. § 1983 claiming false arrest and the use of excessive force, in violation of his rights under the Fourth and Fourteenth Amendments, and malicious prosecution in violation of Illinois law. Holmes settled his claims against Piatek and the Village of Streamwood, Illinois, which employed Piatek. The district court entered

summary judgment against Holmes on the remaining claims against Teipel and his employer, the Village of Hoffman Estates, Illinois, prompting Holmes to appeal. Because the undisputed facts demonstrate that Teipel had probable cause to believe that Holmes had committed a battery on Piatek, we affirm the grant of summary judgment as to Holmes's claim for false arrest. However, we conclude that disputes of material fact exist as to Holmes's malicious prosecution claim as well as his excessive force claim, and for that reason we reverse the grant of summary judgment as to those claims.

**I.**

Late in the evening of June 4, 2003, Detective Piatek, a tactical officer with the special operations unit of the Streamwood police force, was patrolling convenience stores, liquor stores, and gas stations following a series of armed robberies of such establishments in Streamwood and other nearby suburbs northwest of Chicago. Between 11:30 and midnight, Piatek drove by a strip mall containing a 7-Eleven store that had been robbed earlier that same day and on another recent occasion. Piatek noticed an occupied car parked outside the store with its motor and lights off. Holmes, the driver of the car, was talking on a cell phone. His friend, Vonnell Landfair, was sitting next to him in the passenger seat. As Piatek pulled into the parking lot of the strip mall and drove slowly past the vehicle, he observed that it was occupied by two African-American males, one of whom (Landfair) was thin and the other of whom (Holmes) had a more stocky build. Piatek would later testify that he decided to investigate the car and its occupants because he believed the occupants matched the description of the individuals who had robbed the 7-Eleven. But there is some question about whether his belief was accurate as to the race of the two

suspects. A report concerning one of the robberies origi-
nally indicated that the perpetrators were white, although
the report was subsequently revised to indicate they
were black; a report concerning a second robbery indi-
cated that one of the perpetrators was Hispanic. The
robbers had worn ski masks, thereby limiting the avail-
able information about their appearance.

After he reported by radio that he was investigating
a suspicious automobile, Piatek approached the vehicle
and asked its driver, Holmes, to produce his driver's
license. Holmes responded by asking Piatek who he was
and why he needed to see Holmes's driver's license. Piatek
was driving an unmarked car and was dressed in civilian
clothing and so, according to Holmes, he did not realize
that Piatek was a police officer. The parties dispute
whether Piatek identified himself as such to Holmes.
They also dispute the manner in which both Piatek and
Holmes behaved during their initial dialogue. Holmes
represents that he was polite and cooperative whereas
Piatek was foul-mouthed and confrontational; the defen-
dants have indicated that just the opposite was true.

At this point, Piatek asked Holmes to step out of his car.
Holmes complied with the request. But, according to
Piatek, once Holmes was out of the car, he assumed a
combative stance which, coupled with his alleged belliger-
ence, caused Piatek to be concerned for his safety. Piatek
decided to pat Holmes down to verify that he was not
armed, and he advised Holmes of his intent. Piatek turned
Holmes around, so that he was facing his car, and placed
him against the car in order to frisk him.

By this time, Teipel had arrived on the scene and joined
Piatek on the driver's side of Holmes's car. Teipel, an
officer with the Hoffman Estates police department, had
been completing a traffic stop at a gasoline station directly
across the street from the strip mall when he heard

Piatek's radio report concerning a suspicious vehicle. In accord with a custom of providing backup to neighboring police personnel during late-night encounters, Teipel drove his car over to the mall in order to assist Piatek. The parties have given significantly divergent accounts of what occurred following Teipel's arrival. For later reference, we separately recount each of the versions Holmes, Piatek, and Teipel have given, focusing on the points most pertinent to Holmes's claims. Of course, it is Holmes's version that we must credit given the obligation we have at this stage in the proceedings to construe the facts favorably to him. *E.g.*, *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

Holmes gives the following account of events: He was cooperating with Piatek and was passively facing his car when Teipel arrived on the scene. As Teipel walked toward the driver's side of Holmes's car, Piatek said to Teipel, "We have ourselves a smart ass here." Teipel responded, "Oh, yeah?", walked up to Holmes, and slammed Holmes's head hard against the roof his car. Teipel instructed Holmes's passenger, Landfair, who was still seated in the car, to look away. Teipel then grabbed Holmes's left arm while Piatek held his right harm. Piatek, after whispering in Holmes's ear that he was going to hurt Holmes, executed a wristlock on his right hand and arm. A wristlock is a compliance technique that police officers sometimes use to subdue uncooperative individuals. The technique involves bending the wrist back toward the forearm, causing the individual to experience pressure and pain. The wristlock caused Holmes to cry out that Piatek was hurting him. Piatek replied, "I know." While this was occurring, Teipel continued to hold Holmes's left arm behind his back. Piatek then released the wristlock and said to Teipel, "He hit me. Take him down." But according to Holmes, at no time during his encounter with Piatek and Teipel did he strike, push, or resist either of the

officers. After Piatek made this remark to Teipel, the officers threw Holmes to the ground. A smug Piatek told Holmes that he was on the ground because he had been "smart" with the officers; he also advised Holmes that he was under arrest. Teipel handcuffed Holmes and pressed his knee against Holmes's face and kept it there. Holmes advised Teipel that he needed to go to the hospital. Teipel told him to "shut up" and that the only place he was going to was jail. Holmes told Teipel repeatedly that Teipel was hurting him, but each time Holmes said this, Teipel would grind his knee into Holmes's face. This happened more than five times, according to Holmes, resulting in a gash or cut above Holmes's right eye in addition to swelling and redness on the left side of his face. Holmes ultimately was taken to the police station, where he was booked and released on bond. Upon his release, he sought treatment for the injuries to his wrist and face. His wrist was placed in a soft cast, he was given ointment for the abrasions to his face, prescribed a pain reliever, and he was advised to have a specialist check his wrist. No stitches were required, and Holmes later could not recall whether he ever filled the prescription for the pain medication. He did follow up with a physician about his injured arm who advised him that some of the tissues in his wrist had been torn and that he should not use the arm for several weeks.

Teipel gives a much different account of what occurred after Holmes exited his car: Like Piatek, Teipel testified that he believed that Holmes and his passenger matched the description of the two individuals wanted in connection with the recent armed robberies. Teipel observed Holmes step out of the car, turn around, and place his hands on the roof of the car as Piatek prepared to pat him down. But in the midst of the pat-down, Holmes pushed himself off the car, turned in order to face the two officers, and then shoved both of them. Piatek then advised Holmes

that he was under arrest for battery and took hold of Holmes's right wrist. Teipel grabbed Holmes's left wrist and, as Holmes began to struggle, placed his own hand against Holmes's upper back, pushed Holmes against his car, and told Holmes to stop resisting arrest. But when Piatek attempted to place handcuffs on Holmes, Holmes pushed himself backward and caused all three men to fall to the ground. There, while Holmes continued to struggle, the officers managed to secure him in handcuffs. Teipel placed his knees against Holmes's back and shoulder in order to help secure him. Teipel never heard Holmes cry out in pain, and he denied that he and Piatek had thrown Holmes to the ground.

Piatek's recitation of events conforms more closely, although not precisely, with Teipel's version: Once Holmes was facing his car and Piatek began to pat him down, Holmes either flailed his arms backwards and/or pushed himself backward off of the car and tried to shove both Piatek and Teipel (who by now had joined the encounter) out of the way. Piatek advised Holmes that he was under arrest for battery and ordered Holmes to put his hands behind his back. Holmes refused. Piatek and Teipel then grabbed Holmes's arms, and Teipel pushed him against the vehicle. As he did so, Holmes remarked that the officers could not hurt him because he worked out every day. Piatek then applied a wristlock to Holmes's right arm in an effort to subdue him. When Piatek applied the wristlock, Holmes pushed himself backward away from his car, causing all three men to fall to the ground. While on the ground, both officers struggled to get Holmes's hands behind his back so that he could be handcuffed. Piatek once again performed a wristlock, this time on Holmes's left arm. Teipel managed to handcuff Holmes, who finally stopped struggling. Additional officers arrived on the scene, and Holmes was placed in a squad car and taken to the Streamwood police station. Landfair,

Holmes's passenger, was patted down and released from the scene after his identification was checked and verified.

Based on misdemeanor criminal complaints prepared over the two officers' signatures,[1] Holmes was prosecuted in the Circuit Court of Cook County for committing a battery upon both Piatek and Teipel and resisting the efforts of both officers to arrest him. A jury acquitted Holmes of the battery charges and also of the charge that he resisted Teipel's attempt to arrest him. The jury was unable to reach a verdict as to the charge that Holmes had resisted Piatek's attempt to arrest him, and the court declared a mistrial as to that charge.

Following his victory in state court, Holmes filed this lawsuit pursuant to 42 U.S.C. § 1983. Holmes alleged that Piatek and Teipel were liable to him for false arrest and for using excessive force, in violation of his Fourth and Fourteenth Amendment right to be free from unreasonable seizures, and that the officers and their municipal employers also were liable for malicious prosecution under Illinois law. After the defendants answered the complaint, the parties completed discovery and submitted their pretrial order in anticipation of trial. Holmes settled with Piatek and the Village of Streamwood shortly before the scheduled trial date, leaving Teipel and the Village of Hoffman Estates as the two defendants facing trial.

Surprisingly, it was on the date that the district court had set for trial that the court held what amounted to its first status hearing in the case. Early on in the litigation, the court unilaterally had scheduled a trial date and

---

[1] Piatek signed his own name to the charges that Holmes had committed a battery upon Piatek and resisted his efforts to arrest Holmes, and, with Teipel's permission, he signed Teipel's name to the two companion charges involving Teipel.

then denied (by mail) an agreed motion to re-set that date. Thereafter, with the exception of one or two minor procedural motions, the parties proceeded toward trial without the intervention or oversight of the court. None of the defendants elected to file a motion for summary judgment. When the scheduled trial date arrived, the parties appeared before the court ready for trial. But the court announced that it would not proceed with the trial until it had first explored the question whether there had been probable cause to arrest Holmes. Taking the hint, the defendants sought and obtained the court's leave to file a motion for partial summary judgment on that issue.

The district court subsequently entered summary judgment against Holmes on his false arrest and malicious prosecution claims, concluding that Holmes's arrest and prosecution were supported by probable cause to believe that Holmes had committed a crime. The court was satisfied that Piatek, on spotting Holmes's car parked near the 7-Eleven, had reasonable grounds on which to suspect that Holmes might be engaged in criminal activity. R. 59 at 6. That reasonable suspicion supported Piatek's decision to question Holmes, and to demand that Holmes step out of his car and submit to a pat-down to ensure Piatek's safety during the investigative encounter. *Id.*; *see Terry v. Ohio*, 392 U.S. 1, 20-22, 27, 88 S. Ct. 1868, 1879-80, 1883 (1968). It also supported Piatek's and Teipel's subsequent effort to handcuff Holmes, which the court viewed as "'appropriate to accomplish the purposes of an investigatory stop.'" R. 59 at 6-7 (quoting *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir. 1992)); *see United States v. Askew*, 403 F.3d 496, 506-07 (7th Cir. 2005). Crediting the criminal complaints that Piatek and Teipel lodged against Holmes, along with Teipel's arrest report, the court went on to state that while the two officers were attempting to place handcuffs on Holmes, Holmes had pushed the officers away from him. R. 59 at 8-9 (citing Exs. C, D, G,

and H to Plaintiff's Statement of Material Facts (R. 50-4, 50-5, 50-8, 50-9)) and 11 (citing Teipel's arrest report (R. 50-2 at 23, 24)). The court reasoned that Holmes's conduct in shoving the officers supplied them with probable cause to arrest him for both battery and resisting arrest. *Id.* at 8-9. This defeated Holmes's false arrest claim against Teipel and also defeated his malicious prosecution claim against Teipel and the Village of Hoffman Estates. *Id.* at 8-9, 11.

At the court's instruction, the parties then briefed the remaining claim for excessive force, and on review of their memoranda, the court entered summary judgment against Holmes on that claim as well. The court accepted the notion that Teipel had employed some force in his encounter. Specifically, the court assumed that it was he rather than Piatek who had applied a wristlock to Holmes—although no party has alleged that Teipel did this. R. 75 at 7. Rather, Holmes has averred that Teipel helped to hold him while Piatek applied the wristlock; he has also asserted that Teipel himself engaged in separate acts of force, including slamming Holmes's head against the roof of his car and grinding his knee into Holmes's face. In any case, the court found that the level of force Teipel had employed was objectively reasonable. When Teipel arrived on the scene, the court reasoned, Holmes was already out of his car and Piatek was attempting to subdue him. Teipel, aware of the recent string of robberies, believed that Holmes fit the description of one of the robbers. The court went on to note that Piatek told Teipel that Holmes had hit him. And Holmes himself may have said that he lifted weights every day and that the officers could not hurt him, although, in the court's view, this remark did not materially alter the facts of the case. *Id.* at 5-6. Under these circumstances, the court reasoned, it was objectively reasonable for Teipel to apply a wristlock to Holmes's arm. "When Holmes resisted and threatened the officers, a greater amount of force was required, to

ensure both officer[s'] safety, and that the situation did not escalate." *Id.* at 7. The court did not address Holmes's allegations that Teipel had slammed his head down on the roof of his car or that, once the officers had Holmes on the ground, Teipel had ground his knee into Holmes's face.

## II.

With Piatek out of the case, Holmes does not challenge the district court's determination that Piatek had reasonable suspicion to approach and detain Holmes for questioning pursuant to *Terry* and, in conjunction with that stop, to frisk him in furtherance of the officer's safety. Holmes Br. at 4. So we may set that issue aside and assume that Piatek lawfully detained Holmes for questioning and subjected him to a pat-down. The focus of Holmes's appeal is on what took place after that point in the encounter, with the arrival of Teipel. We must decide whether the undisputed facts establish that Teipel had probable cause to arrest Holmes and that he (and via respondeat superior, his municipal employer, the Village of Hoffman Estates) had a legitimate basis on which to initiate charges against him. We must also decide whether any force that Teipel may have employed in seizing Holmes was, as the district court concluded, objectively reasonable.

A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to be commit a crime. *E.g.*, *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam); *United States v. Parra*, 402 F.3d 752, 763-64 (7th Cir. 2005). Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction. *Woods v. City of Chicago*, 234 F.3d 979, 996

(7th Cir. 2000) (quoting *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992)). Probable cause is assessed objectively: a court looks at the conclusions that the arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593-94 (2004); *Whren v. United States*, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774 (1996). In making that assessment, the court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth. *Wagner*, 493 F.3d at 836; *Parra*, 402 F.3d at 764. A police officer may of course exercise common sense and draw upon his training and experience in evaluating the totality of the circumstances confronting him, and a court must likewise make allowance for such judgments in deciding what the arresting officer reasonably might have concluded about the facts. *See United States v. Reed*, 443 F.3d 600, 603 (7th Cir.), *cert. denied*, 127 S. Ct. 183 (2006). If the officer had probable cause to believe that the person he arrested was involved in criminal activity, then a Fourth Amendment claim for false arrest is foreclosed. *Morfin v. City of E. Chicago*, 349 F.3d 989, 997 (7th Cir. 2003) (coll. cases).

Based on facts that Holmes does not dispute, we conclude that Teipel had probable cause to arrest Holmes for battery. Our conclusion does not rest on the version of the facts underpinning the district court's analysis. The district court asserted that Holmes had pushed Piatek and Teipel while the two officers were attempting to secure Holmes in handcuffs in furtherance of the *Terry* stop. R. 59 at 8-9. In this respect, the court assumed the truth of the officers' criminal complaints against Holmes along with Teipel's arrest report. Holmes's act of pushing the two officers, the court concluded, supplied Teipel as well as Piatek probable cause to arrest Holmes for both battery

and resisting arrest. *Id.* at 8-9, 11. But Holmes, like the officers, has personal knowledge of what occurred during the encounter, and he unequivocally denies that he struck, pushed, or resisted either officer. We are obliged to accept Holmes's version of events on summary judgment. *See Payne*, 337 F.3d at 773. The defendants, recognizing the problem with the district court's analysis, posit an alternate basis for the arrest. They contend that Teipel had probable cause to arrest Holmes for battery once Piatek told Teipel that Holmes had struck him. We agree.

When Piatek told Teipel, "He (meaning Holmes) hit me. Take him down.", he gave Teipel reason to believe that Holmes had broken the law by committing a battery on Piatek. *See* 720 ILCS 5/12-3. In making a decision to arrest someone for criminal conduct that he did not witness, a police officer may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth. *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986). "So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest . . . ." *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998). Fellow law enforcement personnel are among the witnesses whose accounts the arresting officer may rely upon. *See Spiegel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 1999); *see also United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). Having just arrived on the scene, Teipel was entitled to rely on Piatek's statement as to what had already occurred and to make an arrest on that basis.

Holmes contends that there is a factual dispute as to whether Piatek actually made this statement to Teipel, but

the record does not bear him out on this point. Holmes himself testified that Piatek made the statement. R. 50-10 at 15 (Holmes Dep. at 54). It is true, as Holmes points out, that neither Piatek nor Teipel testified to this statement at Holmes's criminal trial or in their depositions or wrote of it in their arrest reports and post-arrest memoranda. But this does not mean that the fact of the statement is disputed; on the contrary, neither of the two officers ever denied Holmes's recollection on this point. More to the point, in response to Teipel's statement of undisputed facts below, Holmes admitted that Piatek made this statement, R. 49 ¶ 18; indeed, he included Piatek's statement in his own additional statement of undisputed facts, R. 48 ¶ 20. He is in no position now to contend that the district court should have ignored his own admission that Piatek's statement was an undisputed fact. *See Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993).

The lack of evidence that Teipel heard Piatek's statement is no barrier to summary judgment, as Holmes next argues. Piatek was speaking to Teipel when he made the statement, so it is reasonable to infer that Teipel heard what Piatek said. Nothing in the record suggests that Teipel, who was standing right next to Piatek when he made the statement, might have been unable to hear the statement. Indeed, by Holmes's account, immediately after Piatek told Teipel that Holmes had hit him and to "[t]ake him down," Teipel joined Piatek in throwing Holmes to the ground. R. 48 ¶ 20. The natural (and reasonable) inference is that Teipel heard the statement.

Holmes's final contention, that Teipel knew (or should have realized) that Piatek was lying, lacks record support. Even if we assume, consistent with Holmes's version of events, that Piatek was abusive to him from the start of the encounter and that Teipel joined in the abuse immediately upon his arrival, there is no evidence to support the

notion that Teipel would or should have realized that Piatek was dissembling when he told Teipel that Holmes had hit him. Having just joined the encounter, Teipel's knowledge was limited. Crediting Holmes's own version of the facts, Teipel knew only that Piatek was investigating someone parked at a robbed 7-Eleven, that Piatek was frisking him, that Piatek told him "[w]e have ourselves a smart ass here," and then that "he (Holmes) hit me." R. 48 ¶¶ 14-20; R. 53 ¶¶ 14-20. These facts did not give Teipel reason to doubt Piatek's veracity. Nor does Teipel's own conduct suggest that he could not rely on what Piatek told him as a basis to arrest Holmes. Holmes, of course, has averred that Teipel himself began to physically abuse him almost immediately upon joining the encounter—as by allegedly slamming Holmes's head against the car after Piatek told him that "[w]e have ourselves a smart ass here." Teipel's alleged misconduct certainly is relevant to the excessive force claim, which we discuss below. But his use of force does not support the inference that he could not or did not believe the information that Piatek conveyed to him. It is possible for a police officer to use excessive force to make what is otherwise a legitimate arrest supported by probable cause. *See Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir. 1987) ("False arrest and excessive force are unrelated except in forming a sequence. Arresting a person on probable cause does not justify beating him up, and the beating does not invalidate the arrest."); *see also Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc); *Calvi v. Knox County*, 470 F.3d 422, 431 (1st Cir. 2006).

Teipel thus had probable cause to arrest Holmes based on his fellow officer's description of what Holmes had done. Holmes's seizure was therefore not contrary to the Fourth and Fourteenth Amendments. On that basis, Teipel was entitled to summary judgment on the false arrest claim. It does not matter that this was not the basis for summary

judgment articulated by the district court. Because our review is de novo, we may affirm the judgment on any basis that is supported by the record before us. *E.g.*, *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007).

Probable cause to arrest Holmes for committing a battery on Piatek would also defeat the state-law claim for malicious prosecution insofar as the claim might have been based on that particular battery charge. Among the elements that Illinois law requires a plaintiff to establish in support of a malicious prosecution claim is the absence of probable cause for the prosecution. *See, e.g.*, *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 319 (Ill. App. Ct. 2006). Consequently, a finding of probable cause is an absolute bar to such a claim. *E.g.*, *Mannoia v. Farrow*, 476 F.3d 453, 459 (7th Cir. 2007) (applying Illinois law); *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219-20 (Ill. App. Ct. 2003). Because Teipel had probable cause to believe that Holmes had struck Piatek based on Piatek's statement, Teipel and Hoffman Estates could not be held liable for initiating the prosecution of Holmes on that charge.

However, Holmes was not prosecuted for battery against Piatek alone. He was also tried (and acquitted) on charges that he committed a battery on Teipel and resisted Teipel's efforts to arrest him; indeed, *those* were the two charges that Teipel lodged against Holmes. Holmes emphasizes that his malicious prosecution claim against Teipel and Hoffman Estates is based solely on those latter two charges. And those charges, because they sprang from Holmes's alleged actions against Teipel, were distinct from the charge that Holmes committed a battery against Piatek. Yet, Teipel and Hoffman Estates have assumed that probable cause as to the charge for the alleged battery on Piatek bars the malicious prosecution claim entirely, even to the extent that the claim is based on the other charges for which Holmes was prosecuted. Holmes

contends that the assumption is incorrect. He argues, as he did below, that because he was prosecuted on multiple charges, the basis for each charge must be examined separately, and if probable cause was lacking as to any charge, the defendants still may be held liable for his prosecution on that unsupported charge. He is correct.

As several of our sister circuits have concluded, probable cause to believe an individual committed one crime—and even his conviction of that crime—does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge. *See Johnson v. Knorr*, 477 F.3d 75, 83-85 (3d Cir. 2007); *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998); *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991); *see also Rivera-Marcano v. Normeat Royal Dane Quality A/S*, 998 F.2d 34, 38 (1st Cir. 1993). In this respect, a malicious prosecution claim is treated differently from one for false arrest: whereas probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause, *see Devenpeck v. Alford*, *supra*, 543 U.S. at 153, 125 S. Ct. at 593-94; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006), probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking. *Johnson*, 477 F.3d at 84-85. Logic supports the distinction. An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is *a* reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed. *See Devenpeck*, 543 U.S. at 153-55, 125 S. Ct. at 594; *Johnson*, 477 F.3d at 84. But when it comes to prosecution, the number and nature of the charges matters: the accused must investigate and prepare a defense to each charge, and as the list of charges lengthens (along with the

sentence to which the accused is exposed), the cost and psychic toll of the prosecution on the accused increase. *See id.* at 84, 85; Jacob Paul Goldstein, Note, *From the Exclusionary Rule to a Constitutional Tort for Malicious Prosecutions*, 106 COLUMBIA L. REV. 643, 645 (2006) (quoting *Savile v. Roberts*, 91 Eng. Rep. 1147, 1149-50 (K.B. 1698) (Holt, C.J.) (describing the various injuries underlying a malicious prosecution claim)). At the same time, when an officer prepares and signs a criminal complaint, he typically will have more of an opportunity to reflect on the nature and ramifications of the accused's conduct than he did in making the arrest. It is reasonable to demand that each charge that a police officer elects to lodge against the accused be supported by probable cause. Otherwise, police officers would be free to tack a variety of baseless charges on to one valid charge with no risk of being held accountable for their excess. *See Posr*, 944 F.2d at 100; *accord, Johnson*, 477 F.3d at 84.

We recognize, of course, that because the malicious prosecution claim is one founded on state law, our obligation is to apply Illinois law and, where there are gaps in the pertinent case law, to predict what the Illinois Supreme Court would hold. *E.g.*, *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 441 (7th Cir. 2005). We have found no Illinois Supreme Court case that squarely addresses whether probable cause supporting one criminal charge will foreclose a malicious prosecution claim as to one or more additional charges. However, the Illinois Appellate Court has held that when a malicious prosecution claim is founded on a civil suit, the claim is not foreclosed by fact that the entirety of the suit has not yet been resolved in the plaintiff's favor. *March v. Cacioppo*, 185 N.E.2d 397, 402 (Ill. App. Ct. 1962).

> It would not be just to hold that the defendants must be absolved from liability simply because a small part

of their suit might end in judgment for them, when the far larger part, *the equivalent of a separate claim*, has been decided against them, and where there is reason to believe that *this separate claim* has been prosecuted with malice and without probable cause.

*Id.* (emphasis ours). The *March* decision reflects the same claim-by-claim (or charge-by-charge) analysis that our sister circuits have employed. Our colleagues in the Northern District of Illinois, in a series of decisions addressing malicious prosecution claims sounding in Illinois law, likewise have recognized that probable cause (or a conviction) as to one charge will not preclude a malicious prosecution suit based on a separate charge. *See Trusty v. McCall*, No. 99 C 3992, 1999 WL 787628, at *2 (N.D. Ill. Sept. 24, 1999) (Kocoras, J.) (coll. cases). We have no reason to doubt that the Illinois Supreme Court, if presented with the question, would follow the same approach.

To the extent that this court's dictum in *Penn v. Harris*, 296 F.3d 573, 576-77 (7th Cir. 2002), suggests a contrary rule, we now disavow it. The malicious prosecution claim at issue in *Penn* had been brought as a federal claim under 42 U.S.C. § 1983. However, our then-recent decision in *Newsome v. McCabe*, 256 F.3d 747, 750-52 (7th Cir. 2001), had held that because there is no constitutional right not to be prosecuted without probable cause, a plaintiff could not state a section 1983 claim simply by showing that he was wrongly prosecuted but rather must establish that he was deprived of a specific constitutional right, such as the right to a fair trial. The plaintiff in *Penn* had failed to do this, and for that reason we concluded that his section 1983 claim was defective and the district court had properly disposed of it on summary judgment. 296 F.3d at 576. We noted that although *Newsome* was fatal to a malicious prosecution claim under

section 1983, such a claim could nonetheless be pursued under Illinois law. *Id.* Penn had not asserted a state-law claim. *Id.* But even if he had, we went on to say, the defendants would still have been entitled to summary judgment on that claim. In relevant part, we reasoned that the undisputed facts revealed there had been probable cause to arrest Penn for disorderly conduct. *Id.* at 577. In our view, probable cause to believe that Penn had engaged in the crime of disorderly conduct foreclosed Penn's malicious prosecution claim, notwithstanding the fact that Penn had neither been arrested for nor charged with that offense. "The officers arrested Penn for battery rather than disorderly conduct, but 'even if probable cause did not exist for the crime charged [battery], proof of probable cause to arrest the plaintiff on a closely re-lated charge [disorderly conduct] is also a defense' to a state law claim of malicious prosecution." *Id.* (quoting *Kelley v. Myler*, 149 F.3d 641, 647-48 (7th Cir. 1998)). This portion of *Penn* was quite clearly unnecessary to the result, given that Penn had not asserted a state-law claim for malicious prosecution, and therefore amounts to a dictum that does not bind us in this case. When it sug-gested that probable cause as to one charge foreclosed a malicious prosecution claim on a related charge, the court also departed from the holdings of our sister circuits, whose decisions it did not mention. Moreover, the passage from *Kelley v. Myler* that the court relied upon did not concern a malicious prosecution claim. The language quoted from *Kelley* instead dealt exclusively with a false arrest claim. 149 F.3d at 647-48. Although a malicious prosecution was also at issue in *Kelley*, it was resolved on an entirely different basis. *See id.* at 649. The court in *Penn* simply assumed, without discussion, that the exis-tence of probable cause has the same effect on a malicious prosecution claim as it does upon a false arrest claim. For the reasons we have discussed, that simply is not the case.

*See also Sparing v. Village of Olympia Fields*, 266 F.3d 684, 692 (7th Cir. 2001) ("We are aware of no Illinois case that adopts the closely related offense rule, which we apply in qualified immunity cases, in state law malicious prosecution tort cases.").

Consequently, although there was probable cause to support the charge that Holmes had committed a battery against Piatek, we must separately consider whether there was probable cause to support the other charges for which Holmes was prosecuted. Again, Holmes has made clear that his malicious prosecution claim against Teipel and Hoffman Estates is based solely on the criminal charges that Teipel caused to be brought against him, i.e., the charges that he committed a battery against Teipel and that he resisted Teipel's attempt to arrest him. Holmes Reply Br. at 9-10. We therefore focus our attention on those two claims.

Our analysis may be brief, as it is readily apparent that there are disputes of material fact as to the charges that Teipel initiated. In contrast to the battery charge involving Piatek, these two charges are based on events that Teipel himself witnessed rather than anything Piatek may have told Teipel. Thus, according to Teipel, after he arrived at the scene and came to Piatek's aid in subduing Holmes, Holmes twice pushed himself backward off of his car and against the two officers. The second time Holmes did this, according to Teipel, it caused both the officers and Holmes to fall to the ground. As the officers continued their efforts to handcuff Holmes, he continued to struggle with them, Teipel averred. If we were to credit Teipel's account, we have no doubt that these facts would supply ample cause for the charges that Holmes committed a battery on Teipel and resisted Teipel's attempts to arrest him. *See* 720 ILCS 5/12-3 (indicating that a person commits the offense of battery when he "intentionally or knowingly without legal justifi-

cation and by any means . . . makes physical contact of an insulting or provoking nature with an individual"); 720 ILCS 5/31-1(a) (indicating that a person commits the offense of resisting a peace officer when he knowingly resists or obstructs the performance by one he knows to be a peace officer); *Payne v. Pauley*, *supra*, 337 F.3d at 776 (noting that resistance must be physical in nature). However, Holmes disputes Teipel's account and specifically denies that he ever pushed, struck, or resisted either Teipel or Piatek; Holmes avers that he was cooperative at all times. Again, we must credit Holmes's account at this juncture. *Id.* at 773. Assuming that Holmes did not, in fact, push himself back against Teipel and Piatek or struggle with them as they attempted to place him under arrest, Teipel would have lacked any reasonable basis on which to believe that Holmes had committed a battery upon the officer or resisted arrest.

For these reasons, the district court erred in granting summary judgment to Teipel and Hoffman Estates on the malicious prosecution claim. The existence of probable cause to support the two charges that Teipel initiated depends on whether Holmes actually pushed Teipel and resisted Teipel's attempt to arrest him. The factfinder must resolve whether it is Holmes or Teipel who is telling the truth in this respect.

Finally, we come to the excessive force claim. This claim, because it arises in the context of a seizure of a free citizen, is governed by the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989); *see also Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 598 (2004) (per curiam). The force employed by a police officer is deemed excessive if, in light of the totality of the circumstances, it was greater than was reasonably necessary to effectuate the seizure. *Payne v. Pauley*, 337 F.3d at 778 (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir.

1987)). To assess the degree of force that was justified, a court considers the severity of the crime for which the plaintiff was being detained or arrested, whether he posed a threat to the safety of the officers or to other persons, and whether the plaintiff was resisting the officers and/or attempting to flee. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. We examine the facts as they would have appeared to a reasonable officer on the scene, *ibid.*, keeping in mind that an officer often must make a split-second judgment based on rapidly evolving circumstances, *id.* at 396-97, 109 S. Ct. at 1872; *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005); *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004).

We cannot sustain the entry of summary judgment as to the excessive force claim on the grounds articulated by the district court. The court assumed that the only force Teipel allegedly had employed was a wristlock and concluded that Teipel was justified in using this degree of force in helping Piatek to subdue an individual whom Teipel believed was potentially implicated in a recent series of armed robberies. But it was Piatek, not Teipel, whom Holmes avers applied the wristlock (although Teipel allegedly aided Piatek by holding Holmes). Holmes attributes other uses of force to Teipel that the district court failed to consider: Teipel allegedly slammed Holmes's head against the roof of his car and later ground his knee into Holmes's face once Holmes was on the ground.

Teipel nonetheless contends that summary judgment was appropriate on the same key fact that we have agreed justified Holmes's arrest. Teipel reasons that once Piatek told Teipel that Holmes had struck him, Teipel was justified in believing that Holmes was combative and that a greater degree of force was justified to subdue Holmes and place him under arrest.

However, taking into account both the chronology that Holmes describes, along with his averment that he did not

physically strike or resist the officers, we cannot say as a matter of law that the entire range of force attributed to Teipel was reasonable. As Holmes describes the encounter, Teipel applied force even before he was told that Holmes had struck Piatek. According to Holmes, upon Teipel's arrival, Piatek remarked that "[w]e have ourselves a smart ass here," which caused Teipel to reply "Oh yeah?" and then to slam Holmes's head against the roof of the car. Accepting Holmes's version of events as true, including Holmes's assertion that he never resisted the officers and was cooperative, it is difficult to conceive of a reasonable explanation for Teipel's conduct, and a jury could readily conclude that Teipel used excessive force in knocking Holmes's head against the vehicle. *Cf. Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (slamming plaintiff's head against car excessive where plaintiff had already been secured). Next, according to Holmes, Piatek applied a wristlock to his right arm, causing him to cry out in pain, while Teipel held his other arm. A jury could think Teipel, by holding Holmes, helped Piatek apply excessive and gratuitous force if we assume, as Holmes represents, that he was not resisting the officers and particularly if Teipel heard Piatek whisper "I'm going to hurt you." *See Yang v. Hardin*, 37 F.3d 282, 285-86 (7th Cir. 1994). At that point, Teipel knew (or believed) only that Piatek was investigating Holmes in connection with recent robberies and that Holmes had been a "smart ass" to Piatek, not that Holmes had done or said anything manifesting resistance or the need for the officers to employ increased force. *See Payne v. Pauley*, 337 F.3d at 777 (police officers are expected to be thick-skinned and to exercise restraint in dealing with public). Proceeding according to Holmes's chronology, it was only after that point that Piatek said to Teipel, "He hit me. Take him down." Even if we assume, based on this statement, that Teipel reasonably concluded in light of Piatek's state-

ment that more force would be necessary to control Holmes and place him under arrest, a factfinder might conclude that Teipel proceeded to employ more than was reasonably necessary. It was at that moment, according to Holmes, that the officers threw him to the ground and Teipel ground his knee into Holmes's face and kept doing so despite Holmes's complaints. The finder of fact could conclude that once the two officers had Holmes on the ground and in handcuffs, there was no need for Teipel to grind his knee into Holmes's face, particularly if, as Holmes testified, he was not physically resisting the officers. *See id.* at 780; *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 475 (7th Cir. 1997); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

We have not forgotten Holmes's alleged statement that he worked out every day and that the officers could not hurt him. The district court thought that this added little to the analysis, and we agree that it does not for summary judgment purposes. It was Piatek who attributed this statement to Holmes. Holmes's passenger, Landfair, also recalled him making this statement. Holmes himself did not recall saying anything along this line, but he allowed that he might have, and so we may assume that he did make the statement. What the statement meant, and in particular, whether it could reasonably have been construed as a threat or as an indicator that the officers would have to use enhanced force in order to place Holmes under arrest, is open to question. But even if we assume that the statement justified a more forceful response by Teipel and Piatek, under Holmes's version it would not have justified gratuitous acts akin to Teipel grinding his knee into Holmes's face after Holmes had been secured in handcuffs. Consequently, the statement does not support the grant of summary judgment in Teipel's favor.

That Holmes's injuries may have been minor does not militate against a finding of excessive force, as Teipel contends. Certainly the type and severity of injuries Holmes describes would be relevant to a determination of the degree of force Teipel employed and whether that force was reasonable. *Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993). But the fact that Holmes was not bleeding, did not require stitches, did not require follow-up treatment for most of his injuries, and could not recall whether he obtained the pain medication he was prescribed does not rule out the possibility that Teipel employed force that was not reasonably necessary to secure Holmes. A factfinder might conclude that Holmes's injuries were slight but nonetheless find that Teipel employed more force than was justified. *See, e.g.*, *Lanigan*, 110 F.3d at 470 n.3; *Rambo v. Daley*, 68 F.3d 203, 207 n.2 (7th Cir. 1995); *see also Bastien v. Goddard*, 279 F.3d 10, 14-15 (1st Cir. 2002) (coll. cases).

Finally, the doctrine of qualified immunity does not support the entry of summary judgment. Qualified immunity serves to protect those public officials who have violated a constitutional right when the contours of that right were not sufficiently clear at the time to enable a reasonable official to know that his conduct was prohibited. *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). At the time of Holmes's arrest, it was of course clearly established that a police officer may not use excessive force in arresting an individual. Teipel claims that he was not on notice that the types of force Holmes alleges he employed were impermissible under the circumstances. However, accepting as true Holmes's contention that he did not physically resist the officers, we cannot say that Teipel could have reasonably thought the types of gratuitous force Holmes has described were justified. No reasonable officer could have thought that it was permissible to slam Holmes's head

against the car simply because his fellow officer deemed him a "smart ass," for example, nor could the officer have thought it proper to continually grind his knee into the face of an unresisting arrestee. *E.g.*, *Payne*, 337 F.3d at 780.

## III.

Crediting Holmes's version of the events culminating in his arrest, Officer Teipel had probable cause to arrest Holmes for committing a battery on Detective Piatek based on Piatek's statement that Holmes had struck him. For that reason, we affirm the entry of summary judgment in Teipel's favor as to Holmes's false arrest claim. However, issues of fact persist as to whether Holmes committed a battery upon Teipel and resisted Teipel's efforts to arrest him, precluding a determination as to whether Teipel had probable cause to initiate criminal charges against Holmes for those offenses. Accordingly, we reverse the grant of summary judgment in favor of Teipel and the Village of Hoffman Estates on the malicious prosecution claim. Questions of fact also remain as to the nature and degree of force that Teipel used in arresting Holmes. We therefore reverse the grant of summary judgment as to Holmes's excessive force claim. The case is remanded for trial as to those two claims. Because the district court, in granting summary judgment in favor of the defendants, improperly resolved a number of factual disputes in the defendants' favor, Circuit Rule 36 shall apply on remand. Holmes shall recover the costs of his appeal.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*