In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2846

EDDIE GILL,

*Plaintiff-Appellant,*

*v.*

CITY OF MILWAUKEE, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-cv-00587-RTR — **Rudolph T. Randa**, *Judge.*

ARGUED JANUARY 11, 2017 — DECIDED MARCH 7, 2017

Before BAUER, FLAUM, and EASTERBROOK, *Circuit Judges.*

BAUER, *Circuit Judge.*   In February 2013, Eddie Gill con-
fessed to and was charged with the murder of Jordin Crawley.
Gill spent just over a year in jail awaiting trial. The charges
were dropped, however, after a Milwaukee County Circuit
Court judge suppressed Gill's confession. Gill then filed a
series of federal and state law claims in federal district court

against the City of Milwaukee, Chief of Police Edward Flynn, and six Milwaukee police detectives. The district court entered judgment on the pleadings under Federal Rule of Civil Procedure 12(c) in favor of Defendants on all of Gill's federal claims and dismissed the state law claims without prejudice. For the reasons that follow, we affirm.

## I.  BACKGROUND

On February 3, 2013, Jordin Crawley was shot and killed while standing in a crowd outside a club in Milwaukee, Wisconsin, just after it had closed for the night. Gill exited the club as it was closing and crossed the street to greet a group of friends that he saw at a gas station. After a couple minutes, Gill and the group walked back towards the crowd of people outside the club. Just then, multiple gunshots were fired, killing Crawley and wounding another man.

In the days that followed the shooting, Milwaukee Police detectives collected security video footage from the area and interviewed approximately 20 witnesses. One of the witnesses identified Gill from the video footage of the gas station parking lot. Detective Mark Peterson spoke with Gill on the phone and spoke with his mother in person. Gill's mother explained to Peterson that Gill had cognitive impairments. At approximately 7:30 p.m. on February 12, 2013, Gill voluntarily came to the police station to be interviewed.

Detectives Timothy Graham and Erik Gulbrandson conducted the initial interview. Gill's complaint states that the detectives knew of Gill's intellectual disability prior to the interview, and that it was also apparent through his behavior and answers. During the interview, Gill made multiple

statements that were disproved by the video footage, including the number of people he was with and where he was standing when the shooting occurred. Based on those statements, the detectives arrested Gill for obstruction and immediately read Gill his *Miranda* rights. Gill requested a lawyer, and the detectives ended the interview.

As the detectives transported him to booking, Gill said that he wanted to take a polygraph test and that he wished to waive his right to a lawyer in order to do so. The next morning, Detective James Hensley retrieved Gill from his cell to take the polygraph test. Hensley reiterated that Gill could not take the polygraph without a lawyer present, unless he was willing to waive his right to a lawyer. Gill's complaint states that he interpreted this to mean either that he could take a polygraph without a lawyer or that he could not take one at all. Still, Gill stated that he understood his *Miranda* rights and chose to proceed with the polygraph without a lawyer present. He denied any involvement with the shooting during the examination, which lasted over six hours.

After the polygraph, Detectives Hensley and Billy Ball took Gill to another room and continued interrogating him. The detectives again read Gill his *Miranda* rights, which he waived. Throughout this interrogation, which lasted five more hours, Gill continued to maintain his innocence.

The next morning, February 14, 2013, Hensley began interrogating Gill once again. Gill initially stated that he wanted a lawyer, but Hensley convinced him to waive his rights and continue with the interrogation. Hensley employed several interrogation techniques, including social isolation,

confrontation, theme development, and minimization. He also falsely stated that Gill had been identified as the shooter by an eyewitness, and that Gill had failed his polygraph test. During the course of this interrogation, Gill professed his innocence more than 140 times, but eventually confessed to the shooting. He was charged with first degree reckless homicide and remained in jail.

Gill filed a motion to suppress his confession, which the trial court granted on February 24, 2014. The court specifically noted that Gill was "functionally illiterate," that he had previously been found incompetent to stand trial for a different crime, and that his mother had advised Hensley of his intellectual disability. In light of those facts and the "stressful" interrogations, the court held that his confession was involuntary and inadmissible. As a result, the charges were dismissed on March 13, 2014.

Gill then filed this case in the district court, bringing federal claims under 42 U.S.C. § 1983, as well as supplemental state law claims. He brought claims against each of the individual detectives for violations of his Fifth and Fourteenth Amendment rights, a claim for false arrest, and a claim for concealment of favorable evidence. He also brought claims for conspiracy and failure to intervene, corresponding to each of those claims. Finally, he brought claims against Chief of Police Edward Flynn for supervisory liability, and against the City of Milwaukee for municipal liability. In two written opinions, the district court entered judgment in favor of Defendants on all of the federal claims under Federal Rule of Civil Procedure 12(c). The district court dismissed the supplemental state law claims

without prejudice. Gill now appeals the judgment on his federal claims.

## II. DISCUSSION

We review *de novo* an entry of judgment on the pleadings under Rule 12(c). *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Id.* Therefore, we must determine whether the complaint states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Fifth and Fourteenth Amendment Claims

Gill claims that the detectives coerced his confession in violation of his right against self-incrimination under the Fifth Amendment, as well as his substantive due process rights under the Fourteenth Amendment. He also claims that the detectives are liable for conspiracy and failure to intervene based on these violations. Defendants argue that they are entitled to qualified immunity on these claims.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To determine whether an official is entitled

to qualified immunity, we must consider two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2016) (citation omitted). We have the discretion to choose which of these inquiries to address first. *Pearson*, 555 U.S. at 236. Because the answer is dispositive, we address only whether the right at issue was clearly established.

"A clearly established right is one that is sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (citation and quotation marks omitted). The Supreme Court has continually reiterated that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and quotation marks omitted). While a case directly on point is not required, "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 551 (citation omitted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (citation omitted).

Gill argues that the detectives violated his Fifth Amendment right when the "unconstitutionally coerced statements" were used against him in his criminal case, specifically in his preliminary hearing. He then claims that the detectives also violated his Fourteenth Amendment substantive due process right "to be free from coercive interrogation tactics." Both claims depend upon the coercive nature of the interrogation. Gill argues, therefore, that his right to be free from coercive

interrogation was well established, such that the unconstitutionality of Defendants actions was settled.

To support that argument, Gill relies primarily on two principles from our case law. First, he points to the proposition that individuals with a diminished mental capacity can be particularly susceptible to coercive interrogation tactics. *See, e.g.*, *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) (citing *Andersen v. Thieret*, 903 F.2d 526, 530 n. 1 (7th Cir. 1990)). Second, he cites cases recognizing that interrogation tactics that "shock the conscience" may give rise to substantive due process claims. *See, e.g.*, *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)); *see also Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006)). He argues that, together, these principles have clearly established his right to be free from coercive interrogation.

This characterization of the right at issue, however, is precisely the type of "high level of generality" the Supreme Court has rejected in the qualified immunity context. *See White*, 137 S. Ct. at 552. Whether interrogation tactics are unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances present in a particular case. Indeed, our cases have highlighted that "[t]here is no clear-cut analysis to determine what constitutes 'conscience–shocking' conduct … ." *Fox*, 600 F.3d at 841; *see also Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("Determining what constitutes such behavior can be difficult … ."). This is true even where the officers have knowledge of a witness's cognitive impairment. *Cairel*, 821 F.3d at 833–34. The right "to be free from coercive interrogation" is highly generalized. Therefore, it cannot be the basis for defeating a qualified immunity defense, unless there

is closely analogous precedent that is "particularized" to the facts of the instant case. *See White*, 137 S. Ct. at 552.

"When looking at closely analogous cases to determine if a right was clearly established at the time of violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010). Gill has not cited, and we have not identified, any precedent from the Supreme Court or this Circuit that puts the unconstitutionality of the officers' conduct here "beyond debate." *See Mullenix*, 136 S. Ct. at 308.

When no such precedent exists, we look outside our Circuit "to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Escobedo*, 600 F.3d at 781 (citation and quotation marks omitted). Gill relies exclusively on two cases from the Eighth Circuit that he argues clearly establish the contours of the right violated here. *See Livers v. Schenk*, 700 F.3d 340 (8th Cir. 2012); *Wilson v. Lawrence Cty.*, 260 F.3d 948 (8th Cir. 2001). In both cases, the court denied officers summary judgment after determining that there were questions of fact as to whether the interrogation methods in question violated the Fifth and Fourteenth Amendment rights of a mentally disabled suspect. *Livers*, 700 F.3d at 354; *Wilson*, 260 F.3d at 954.

In our view, however, these two cases from another circuit are insufficient to establish a "clear trend" indicating that recognition of this right as clearly established in this Circuit is "merely a question of time." *Escobedo*, 600 F.3d at 781 (citation omitted). This is particularly true in light of our recent holding

in *Cairel*, where we rejected a closely similar substantive due process claim based on the interrogation of a suspect with a cognitive disability. *Cairel*, 821 F.3d at 833–34. There, the officers interrogated the suspect without a lawyer present, despite the fact that they were "aware of [the suspect's] disability and knew that he might not have been fully able to understand what was going on." *Id.*

In sum, Gill has failed to demonstrate that his right to be free from the interrogation tactics used here is clearly established. There is no precedent that places the constitutionality of the detectives' actions "beyond debate." *See Mullenix*, 136 S. Ct. at 308. For that reason, Defendants are entitled to qualified immunity on Gill's Fifth and Fourteenth Amendment claims.[1]

Gill's corresponding claim against the detectives for failure to intervene must also fail. To succeed on this claim, Gill must demonstrate that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). As we have demonstrated, Gill's right to be free from these interrogation tactics was not clearly established. It follows then, that the detectives would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene. Similarly, because the Defendants are entitled to qualified immunity on the underlying claims, they

---

[1] While we have determined that the specific right at issue here has not been well established, we must make clear that nothing in this opinion should be construed as condoning or approving the specific behavior and tactics of the detectives in this case.

are entitled to judgment on the corresponding conspiracy claims. *See House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992) (noting that "[a] person may not be prosecuted for conspiring to commit an act that he may perform with impunity").

### B. False Arrest Claim

Next, we turn to Gill's claim for false arrest, which was also accompanied by claims for conspiracy to commit and failure to intervene in the false arrest. Gill was arrested on February 12, 2013, for obstruction after lying to the detectives in his initial interview. After Gill confessed two days later, he was charged with murder, while he was still in jail for the obstruction charge. Gill does not quarrel with the arrest for obstruction. Instead, he argues that a "second and separate arrest" occurred when the murder charge was filed. The false arrest claim, therefore, is based on his theory that there was no probable cause for the "second arrest" (*i.e.*, the murder charge), in light of the finding that his confession was involuntary.

Probable cause acts as an absolute bar to a claim for false arrest. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010). We have previously explained that "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause … ." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Gill concedes that there was probable cause for his initial arrest for obstruction. He remained in custody for that arrest until he confessed and was charged with murder. There was no period of release followed by a subsequent arrest.

Thus, the existence of probable cause for his arrest for obstruction bars his claim for false arrest. *See id.*

Gill attempts to avoid this conclusion by arguing that *Holmes* only applies to a situation in which multiple charges are filed simultaneously. There is no indication in *Holmes*, however, that its reasoning applies only to charges filed simultaneously. Indeed, the Supreme Court has rejected such a distinction when determining the validity of an arrest. *Devenpeck*, 543 U.S. at 153-54.

What is important here is that the officers had probable cause for Gill's arrest for obstruction and that he was in custody for that arrest when he was charged with murder. There was no "subsequent arrest." Therefore, Gill's claims for false arrest fails. For that reason, his related claims for conspiracy and failure to intervene, must also fail. *See Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996) (explaining that there can be no conspiracy liability under § 1983 where there is no denial of constitutional rights)*; see also Leaf v. Shellnut*, 400 F.3d 1070, 1093 (7th Cir. 2005) (denying a claim for failure to intervene where there was no underlying constitutional violation).

### C. *Brady* Claim

Gill's next claim is that, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the detectives violated his due process rights when they failed to disclose certain witness statements. He also brought corresponding conspiracy and failure to intervene claims against the detectives for this failure. On February 20, 2014, the trial judge handling Gill's case learned that two of the detectives had recently filed incident reports of witness interviews that occurred over a year earlier. Gill claims that

these statements supported his original account of the events, and that the officers withheld them from Gill, the prosecutors, and the trial court until approximately a year after Gill's arrest.

To prevail on a *Brady* claim for an officer's failure to disclose evidence, a plaintiff must show that (1) the evidence was favorable to him; (2) the officer concealed the evidence; and (3) the concealment prejudiced him. *Cairel*, 821 F.3d at 832. "Prejudice requires proof that the failure to disclose caused a deprivation of the accused's liberty." *Id.* Gill argues that his claim should move forward because he has sufficiently alleged that the concealment here prejudiced him by causing his continued pretrial imprisonment.

Our cases, however, have consistently held that *Brady* does not require the disclosure of favorable evidence prior to trial. *Armstrong v. Daily*, 786 F.3d 529, 552 (7th Cir. 2015) (recognizing that *Brady* disclosure obligations can be met "in the time leading up to or even during trial"); *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001) (explaining that "*Brady* does not require pretrial disclosure" and demands only that disclosure come with enough time for a defendant to make use of the evidence). Gill argues, however, that language from our recent cases suggests that his claim is viable because of his pretrial detainment, despite the ultimate dismissal of his charges. As support, he specifically points to *Cairel*, which notes that "[a]s we explained in *Armstrong*, … the key to a civil *Brady* claim is not conviction or acquittal, but a deprivation of liberty." *Cairel*, 821 F.3d at 833 (citing *Armstrong*, 786 F.3d at 553–55).

In *Armstrong*, we held that the plaintiff had a viable claim where he alleged that state lab technicians deliberately destroyed exculpatory evidence, which caused him to remain in prison before the charges against him ultimately were dismissed before trial. 786 F.3d at 553. *Armstrong* made clear, however, that "*Brady* cases involving failures to disclose evidence are plainly distinguishable from this case involving destruction of evidence." *Id.* at 552. In failure to disclose cases, such as Gill's, "[t]he critical question under *Brady* is whether the exculpatory evidence is 'disclosed in time for the defendant to make use of it.'" *Id.* (quoting *Grintjes*, 237 F.3d at 880); *see Saunders-El v. Rhode*, 778 F.3d 556, 562 (7th Cir. 2015); *see also Bielanksi v. Cty. of Kane*, 550 F.3d 632, 645 (7th Cir. 2008). Had Gill's case proceeded to trial, he would have been able to make use of the statements that the officers failed to disclose initially. For that reason, his *Brady* claim fails. Again, Gill's corresponding conspiracy and failure to intervene claims fail because there is no underlying violation. *See Hill*, 93 F.3d at 422; *see also Leaf*, 400 F.3d at 1093.

### D. Supervisory Liability and *Monell* Claims

Gill's remaining claims are against Chief of Police Flynn for supervisory liability and against the City of Milwaukee for municipal liability under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). The district court held that Gill's complaint did not plausibly allege the necessary elements of either claim.

To succeed on a claim for supervisory liability, a plaintiff must show that the supervisor was personally involved in the constitutional violation. *Matthews v. City of E. St. Louis*, 675 F.3d

703, 708 (7th Cir. 2012) (citation omitted). That means the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Id.* (citation and quotation marks omitted). Gill's complaint fails to plausibly allege that Chief Flynn had such personal involvement in the detectives' conduct. It states only that Chief Flynn failed to train the detectives adequately and that he was "deliberately and recklessly indifferent" to the detectives' actions. There is, however, no allegation or plausible inference that Chief Flynn knew about or was personally involved in the specific conduct. Therefore, we agree with the district court that Gill cannot maintain a claim for supervisory liability.

Gill also failed to plead a plausible *Monell* claim. His complaint states that the City of Milwaukee has a *de facto* policy of "placing an emphasis on clearing cases and convicting suspects over seeking truth," which led to the coercion of his confession and the concealment of exculpatory evidence. A municipal body may be liable for constitutional violations "pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91. To succeed on this *de facto* custom theory, the plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents. *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). At the pleading stage, then, a plaintiff pursuing this theory must allege facts that permit the reasonable inference that the practice is so widespread so as to constitute a governmental

custom. *See McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 683).

Gill's complaint fails to do so. It does not provide examples of other Milwaukee police officers taking actions similar to those complained of here. More importantly, it does not plausibly allege that such examples exist. Instead, it simply states that this *de facto* policy caused the "Defendant Detectives named *supra* to commit the aforesaid wrongful acts against Plaintiff." The specific actions of the detectives in Gill's case alone, without more, cannot sustain a *Monell* claim based on the theory of a *de facto* policy. *Id.*; *see also Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) (explaining that "isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise" for a widespread practice claim under *Monell*).

### III.  CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment on the pleadings on all of Gill's claims before us. The judgment of the district court is AFFIRMED.