In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1813

VAUGHN NEITA,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-00595 — **Joan H. Lefkow**, *Judge.*

ARGUED JANUARY 22, 2024 — DECIDED AUGUST 26, 2025

Before EASTERBROOK, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Vaughn Neita sued the City of Chicago and two of its police officers after the officers seized his dog and arrested him for animal abuse. At an earlier stage of the case, the district court dismissed some of his claims, including a federal claim for malicious prosecution. The court later granted the City and the officers summary judgment, concluding that the officers had, at the very least,

arguable probable cause to arrest Neita and therefore enjoyed qualified immunity from suit. Because genuine issues of material fact remain as to whether the officers had even arguable probable cause, we reverse the district court's finding of qualified immunity. We otherwise affirm the court's discovery and dismissal rulings.

## I.  Background

We recount the facts in the light most favorable to Neita as the party opposing summary judgment. *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025).

### A.  Anonymous Tip

Chicago Police Department Officers Karen Rittorno and Domingo Enriquez were assigned to a unit that investigates calls about animal abuse and neglect. On February 4, 2018, Rittorno received an email from Andreas Morgen, an agent with the City's Department of Animal Care and Control (ACC). In the email, Morgen asked Rittorno to investigate two anonymous reports of animal abuse at a property on North Central Park Avenue. Morgen's email summarized the reports, which are called service requests or "SRs" for short:

> We have an "Animal In-humane SR" that I'm asking that you check out if possible. It's right up your alley.
>
> At the above address we [have] two reports of a dog being kept in in-humane conditions. The owner is a male who allegedly is squatting at the above address in either a camper/trailer or a small shipping container. We only have a first name of "Von". He allegedly has multiple

"animal cruelty convictions" on his record. Can you investigate this & contact us if you find grounds to impound the dog? I'd appreciate your assistance in this matter. Based upon the alleged criminal history we have not dispatched an ACO out to investigate. I'll scan and email you the two SRs.

A few minutes later, Rittorno received one of the SRs.[1] The SR, like Morgen's email, described an anonymous tip that a squatter named "Von" had a dog that was being beaten and was tied up outside all day, every day, with no shelter, water, or food. The SR also noted the tipster's allegation that "Von" had multiple animal cruelty convictions and was living in a camper or trailer on the property.

### B. The Investigation

Three days later, on February 7, Rittorno and Enriquez went to the address identified in Morgen's email. The officers reported the weather that day was 19 degrees Fahrenheit with a wind chill of 7 degrees. It was not snowing when they arrived, but there were several inches of snow on the ground.

The property consisted of a fenced lot with multiple vehicles parked throughout, including a shipping container, construction machinery, and a camper. The shipping container had graffiti on it. Behind a row of these vehicles, near the back of the property, sat a doghouse Neita constructed for his dog—a short-haired American Pitbull named Macy. Macy's

---

[1] Although Morgen's email references two SRs, the record only reflects that Rittorno received one.

house was a rectangular structure made of plywood with a plastic cover draped over the entrance.

When the officers arrived, they spotted Macy inside her house, peeking out of the front entrance. She was wearing a chain-like collar and was tethered to the bumper of a truck parked next to her house using two rope leashes tied to each other. The leashes were long enough to allow her to enter and exit her house and roam a few feet in the opposite direction. The officers did not observe any signs that Macy was underweight or unhealthy. Photos taken at the scene show that she was a robust, muscular dog. According to the officers, Macy picked up her paws—as if to signal the ground was cold— and began to shiver.

Inside her doghouse, Macy had a heater and two bowls. Rittorno testified that the heater was working but did not provide enough heat to keep the house warm. As for Macy's bowls, the parties agree one was empty, but they dispute the state of the second bowl. According to Neita, this bowl was also empty. At her deposition, Rittorno testified Macy's second bowl had frozen water in it. Photos taken of the scene that day do not shed any light on the issue.

As for the doghouse's floor, it consisted of the same plywood material as the walls and roof, with a flattened cardboard box on top. Rittorno did not lift the cardboard to check if there was any padding underneath. Neita maintains he had placed foam padding between the cardboard and plywood floor for Macy.

Although the vehicles on the lot had several inches of snow accumulated on top, the roof of Macy's house did not. Enriquez saw frost on the floor and along the top of the house;

Rittorno only saw ice "on the wood on the bottom." The officers did not observe (and video taken shortly after the officers arrived did not show) any feces, urine, or excessive dirt inside or around Macy's house.

After about ten minutes at the property, Enriquez untied Macy from the truck's bumper and walked her to the officers' van, where he turned on the heat. Once Macy was inside the van, Rittorno took photos of what she had observed inside the doghouse. She also radioed requests for ACC to provide transport for Macy, and for a "beat officer" who could document the situation with his body camera.

Officer Anthony Graffeo arrived before the ACC officer to capture with his body camera the officers' recreation of how they found Macy. Graffeo entered the property with Rittorno, Enriquez, and several other officers of the Chicago Police Department's animal crimes team who had also responded to Rittorno's call. Rittorno also brought Macy along. The bodycam footage shows Macy playing with the officers and wagging her tail as they made their way back to the property from the van. The officers' descriptions of Macy's playfulness differed. Rittorno maintained Macy's demeanor throughout the investigation was playful and caring. Enriquez testified she was not playful.

Once on the property again, Macy stopped to pee, prompting Rittorno to point at her and say "She don't even wanna go back, look at her. She does not want to go back." Off-camera, an officer can be heard calling Rittorno a "dog whisperer." When Rittorno was asked at her deposition what observations led her to believe that Macy did not want to go back, she responded: "It was jumping back toward and jumping on Officer Enriquez." When deposed, Rittorno also conceded that

Macy urinating was an indication that the dog had recently consumed water.

When the officers reached the back of the property where the doghouse was located, Enriquez retied Macy to the bumper of the truck. The video shows that Macy continued to wag her tail and play with the officers. In the meantime, Rittorno pulled back the plastic draping and, from the doghouse's entrance, took photos of its interior. Graffeo briefly captured the outside of the house on video. The officers then huddled and took turns petting Macy. After less than ten minutes at the property, the officers untied Macy and left once more to await ACC. Macy is never seen shivering or showing discomfort in her paws during Graffeo's footage.

### C.  Neita's Arrest

At some point, Neita arrived at the property.[2] When he saw Macy in the officers' van, he told the officers he owned Macy and the lot. The officers informed him they were investigating an animal abuse complaint and asked for Neita's identification or papers to confirm Macy's ownership. Neita responded he did not have those documents with him, and that an identification would not confirm Macy's ownership. Neita testified that he also told the officers he had gone to a neighbor's house only briefly and left Macy outdoors during

---

[2] The timeline of Neita's arrival is unclear from Enriquez's deposition testimony. Enriquez explained that Neita arrived before the officers' second entry to the property, stayed outside, and interacted with them again after they exited the property. But Neita does not appear in Graffeo's bodycam footage, which captures everything from his arrival at the property through the officers' exit. Defendants later asserted that Graffeo and the other officers had already left when Neita approached Rittorno and Enriquez.

that time. When an ACC officer arrived, Neita indicated that Macy had a microchip that could identify him as the owner.

Throughout this interaction, Neita was on the phone with his sister, a Chicago police officer. At his sister's behest, Neita asked for a "white shirt," which the officers understood to mean a supervisor. Shortly thereafter, the officers arrested Neita for animal abuse and neglect. While Neita was being arrested, Officer Warnecke, the transport officer, arrived. Warnecke's body camera captured Neita's handcuffing. After Neita's arrest, Sergeant Mark Foster also arrived. Foster did not turn on his camera to capture his conversations with Rittorno, Enriquez, or Neita. Warnecke's footage partially captured Foster's conversation with Neita.

The following day, on February 8, Rittorno filed an arrest report. The arrest report offered the following description of the events leading to Neita's arrest:

> [Arresting officers] arrived at above location and observed (1) Female Pit Bull Breed Dog tethered to a Truck in what appeared to be a vacant lot…. The outside Temperature was approximately 19 Degrees with a Wind Chill of 7 Degrees and a low Temperature of 3 Degrees for the day. A wooden make shift box was provided for shelter and was observed without any food or water. The make shift box was also without padding and was on the ground in the snow, instead of the required minimum 2 inches off the ground. (Photos Taken)….

A couple of weeks later, Rittorno supplemented her arrest report. The supplemental report included a similar narrative about the conditions observed that day, but expanded on Neita's request for a supervisor and his processing for arrest. Neither report referenced Macy's bowls, the heater or temperature inside Macy's house, or Macy's collar.

**D. Criminal Proceedings**

Shortly after his arrest, Neita was charged in the Circuit Court of Cook County with violating two misdemeanor provisions of the Illinois Humane Care for Animals Act: 510 ILCS 70/3 and 510 ILCS 70/3.01. The first provision, Section 70/3, lists several duties animal owners have, including providing sufficient food and water, adequate shelter and weather protection, and humane care and treatment. This provision also prohibits tethering a dog outdoors with a "choke-type collar."[3] 510 ILCS 70/3(b)(5). The second provision, Section 70/3.01, prohibits subjecting animals to abuse, hunger, or exposure, including exposing pets to cold weather conditions for prolonged periods of time.[4]

As part of Neita's criminal charges, the officers swore: "It was 19 degrees and snowing outside, the dog was chained to a bumper of an abandoned vehicle, no food or water, padding

---

[3] A person convicted of violating these sections of the Act is guilty of a class B misdemeanor. 510 ILCS 70/3(d)-(e). In Illinois, Class B misdemeanors can result in imprisonment of up to six months. 730 ILCS 5/5-4.5-60.

[4] A person convicted of violating this section of the Act is guilty of a Class A misdemeanor. 510 ILCS 70/3.01(d). In Illinois, Class A misdemeanors can result in imprisonment of up to one year. 730 ILCS 5/5-4.5-55.

on the ground or a 2 inch minimum ground clearance inside a wooden shelter." The charges did not mention the frozen water bowl Rittorno later claimed to see, the heater, the temperature inside Macy's house, or Macy's collar. And neither provision Neita was charged with violating requires that owners provide padding or raise living quarters at least 2 inches from the ground.

The prosecution filed a motion seeking to force Neita to post security and forfeit Macy. In March 2018, at a hearing on the motion, Rittorno testified that her supplemental arrest report included all her observations leading to Neita's arrest. She also testified that Macy's water bowl was frozen. But, on cross, she admitted her report did not mention this. Dr. Lindsay Gardner, a veterinarian with ACC who examined Macy, also testified. Dr. Gardner's overall findings were that Macy was an "adult female intact, grey with white, full breed mix, with cropped ears, mature mammary glands, normal body condition, and some dirt in the fur coat." The state court denied the prosecution's petition to forfeit Macy. Neita was then able to retrieve Macy from ACC after paying $369.00.

In April 2018, the criminal case proceeded to a bench trial. During trial, the prosecution introduced four photos Rittorno had taken of Macy's house. Rittorno admitted she had not previously disclosed the photos, and then testified she had no other evidence on file she had not provided. The state court granted a directed finding in Neita's favor. The court found that, even in the light most favorable to the prosecution, (1) there was no requirement for Macy's house to be 2 inches off the ground, (2) Macy's tethering instrument was long enough for her to get in and out of the house, (3) her house had a heater and bowls, and (4) even if it was difficult to tell if there

was anything in the bowl, Dr. Gardner had testified Macy was intact and healthy. This concluded Neita's criminal charges.

### E.  Neita's Civil Suit

In January 2019, Neita sued Rittorno, Enriquez, the City, and an ACC officer who has since been dismissed from the case. Neita brought claims against Rittorno and Enriquez under 42 U.S.C. § 1983 for false arrest (Count I), illegal search and seizure (Count II), malicious prosecution (Count III), conspiracy to deprive of constitutional rights (Count IV), retaliation (Count V), and failure to intervene (Count VI). Additionally, Neita brought state claims against the City for indemnification (Count VII) and malicious prosecution under the theory of respondeat superior (Count VIII). Finally, Neita claimed intentional infliction of emotional distress (Count IX) against all defendants.

In his complaint, Neita alleged that the "material facts relied on by the Defendants to support probable cause to arrest [Neita], to seize Macy, and to prosecute [Neita] [were] set forth in": (1) the arrest report; (2) the supplemental arrest report; (3) the March 2018 hearing transcript; and (4) the April 2018 trial transcript. Defendants admitted this allegation in their amended answer.

Defendants filed a motion to dismiss that the district court granted in part. The court dismissed Count III for malicious prosecution under § 1983; Count V, but only insofar as Neita alleged retaliation for a prior civil rights lawsuit; and Count IX for intentional infliction of emotional distress.

A few months into discovery, Neita moved for partial summary judgment on the issue of probable cause. The district court denied Neita's motion, holding that a reasonable

jury could find that, at the time officers signed Neita's charging document, they had probable cause to prosecute him.

Before the district court denied Neita's motion for partial summary judgment, Neita sent interrogatories requesting that Defendants identify each fact that supported probable cause. Defendants objected to the interrogatories on several grounds but said they would produce five documents: Neita's arrest report, the case reports, the Chicago Police Department's raid file for Neita, ACC records, and the Cook County Circuit Court file. Neita also asked Defendants to produce any body camera footage associated with his arrest. In April 2020, Defendants produced two video files, neither of which contained Graffeo, Foster, or Warnecke's bodycam footage. It was not until October 2020 that defense counsel Emily Dory emailed Neita's counsel, stating it had "recently come to Defendants [sic] attention that assisting units on scene were wearing body-worn cameras," and apologizing for Defendants' late production. Dory also offered to reschedule Defendants' upcoming depositions and pay for the costs associated with rescheduling.

After a series of discovery extensions, the district court gave Neita the opportunity to file a second motion for summary judgment, which Neita declined. Following the close of discovery, Defendants moved for summary judgment as to all remaining counts. Concurrent with the motion, Rittorno filed a sworn affidavit where she admitted, contrary to her prior deposition testimony, that she *had* reviewed the ACC service request summary report, or SR, before her February 7 investigation at Neita's property. She also attached to her affidavit copies of Morgen's emails, the SR, and several photos of Macy and her house.

The district court granted summary judgment to Defendants. The court found that Neita's claims of false arrest, illegal search and seizure, and retaliation (Counts I, II, and V) failed on their merits because Defendants were entitled to qualified immunity. And because Neita's conspiracy and failure to intervene claims (Counts IV and VI) depended on Counts I, II, and V as basis for a constitutional violation, the court dismissed those as well. Finally, the court declined to exercise supplemental jurisdiction over Neita's state law claims of indemnification and malicious prosecution (Counts VII and VIII). It dismissed these claims without prejudice, allowing for refiling in state court.

The district court addressed several discovery-related issues too. The court declined to sanction Defendants for failing to produce bodycam footage earlier. It also rejected Neita's position that Defendants' initial assertion of the grounds for probable cause (in their amended answer to the complaint) was a judicial admission. Furthermore, the court did not accept Neita's invitation to disregard the affidavit Rittorno submitted at summary judgment as a "sham" affidavit. Instead, the court acknowledged there were genuine issues about Rittorno's credibility and thus refused to rely on her deposition testimony as the sole evidence in support of any fact.

Neita presents assorted challenges on appeal. First, Neita challenges several of the district court's decisions related to discovery. Second, Neita challenges the court's grant of qualified immunity to Rittorno and Enriquez. Finally, Neita challenges the dismissal of his federal malicious prosecution claim. We address each issue in turn.

## II. Discovery Matters

Neita directs our attention to three discovery-related decisions by the district court. We review such decisions for abuse of discretion. *Alicea v. County of Cook*, 88 F.4th 1209, 1218 (7th Cir. 2023). This is a deferential standard because "the district court is in the best position to decide the proper scope of discovery and to settle any discovery disputes." *Id.* (quoting *Wanko v. Bd. of Trs. of Ind. Univ.*, 927 F.3d 966, 969 (7th Cir. 2019)). Having conducted our review, we find no abuse of discretion.

First, Neita takes issue with the district court's refusal to interpret as a judicial admission the four documents that Defendants listed in their amended answer as the *only* facts that might support probable cause. The documents included: the arrest report, the supplemental arrest report, and two transcripts from Neita's criminal proceedings. According to Neita, Defendants' answer conceded that no other facts outside of these documents would be material to support probable cause.

"Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Such statements "have the effect of withdrawing a fact from contention" and "may not be controverted at trial or on appeal." *Id.* (citing Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726 (Interim Ed.); John William Strong, *McCormick on Evidence* § 254, at 142 (1992)). To be binding, a judicial admission must be a deliberate, clear, and unequivocal statement. *See Medcom Holding Co. v. Baxter Travenol Lab'ys, Inc.*, 106 F.3d 1388, 1404 (7th Cir.

1997) (citing *In re Lefkas Gen. Partners*, 153 B.R. 804 (N.D. Ill.1993)).

Although Defendants' amended answer was an admission contained in their pleadings, it is not clear that it could preclude them from later asserting additional grounds for probable cause based on other evidence in the record. This is because "[p]robable cause is assessed objectively: a court looks at the conclusions that the arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007) (citation omitted). Thus, Defendants can build on the arguments supporting probable cause as long as these are drawn from information known to Rittorno and Enriquez at the time of Neita's arrest. (To be clear, this does not mean that officers can later supplement their probable cause arguments based on information *not* known to them at the time of an arrest.) Furthermore, Defendants' arrest report stated: "The facts for probable cause to arrest AND to substantiate the charges, include, *but are not limited to,* the following." (emphasis added). This statement, although binding as to the information included, leaves room to incorporate additional information. We therefore agree with the district court's determination that Defendants' answer did not limit their ability to present grounds for probable cause based on other evidence in the record.

Second, Neita argues that Rittorno's affidavit, submitted at summary judgment, contradicted her prior police reports, criminal case testimony, and deposition testimony, and sought to expand what she knew before arriving at the scene

of the arrest. Thus, Neita asserts, the district court erroneously relied on what amounted to a sham affidavit. We disagree.

A sham affidavit has "contradictions so clear that the only reasonable inference [is] that the affidavit was a sham designed to thwart the purpose of summary judgment." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). A sham affidavit is not permitted because it would otherwise severely undercut "the very purpose of the summary judgment motion." *Id.* (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996)). "Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony and thus the sham-affidavit rule applies only when a change in testimony 'is incredible and unexplained,' not when the change is 'plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory.'" *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016). "[B]ecause summary judgment is not a tool for deciding questions of credibility," we must apply the sham affidavit principle "with great care." *Castro*, 786 F.3d at 571.

Here, Rittorno offered a plausible explanation that she was confused, not engaging in a sham. Rittorno said she made a mistake at her deposition because she only reviewed one of the emails at issue. Recall, on February 4, 2018, Rittorno received two emails, the second of which attached the summary report of the anonymous complaint, otherwise referred to as an SR. This happened a few days before Rittorno and Enriquez went to Neita's property. During Rittorno's November 2020 deposition, Neita's counsel showed Rittorno a copy of the first email, which referenced, but did not attach the SR. Neita's counsel then asked Rittorno if she had received the

referenced SR. Rittorno initially responded with some reservation: "I—I want to say yes, they're in the—I always pick up packets with the photos, and I want to say that those SRs were in there." Moments later, Neita's counsel asked once more: "You didn't have the SRs before you went to the scene, correct?" To which Rittorno responded: "That's correct." In April 2022, as part of Defendants' motion for summary judgment, Rittorno submitted an affidavit stating that she had in fact received the SR before going to the scene, and that she had been mistaken during her deposition because she did not have the opportunity to review the second email.

Although we agree with the district court's credibility concerns about Rittorno on several fronts, her change in testimony on this specific issue was plausible and suitably explained. *See Funds in the Amount of $271,080*, 816 F.3d at 907 (stating that the sham-affidavit rule does not apply where the change in testimony is "plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory"). Thus, we find no abuse of discretion in the district court's decision to not exclude her affidavit at summary judgment.

Lastly, Neita argues the district court erred by not imposing sanctions on Defendants under Federal Rules of Civil Procedure 26(g) and 37(c) for two reasons. One, because Defendants certified their discovery responses were complete and accurate but failed to disclose the bodycam footage. And, two, because they failed to produce probable cause evidence relied on at summary judgment. We find no error.

As with discovery-related matters, we review the refusal to impose sanctions for an abuse of discretion. *Evans v. Griffin*, 932 F.3d 1043, 1045 (7th Cir. 2019); *Uncommon, LLC v. Spigen*,

*Inc.*, 926 F.3d 409, 417 (7th Cir. 2019). Our review of the district court's decisions are deferential. We review its decision on whether Rule 26(g) was violated for clear error, *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 407–08 (7th Cir. 1998), and its determination as to Rule 37(c) for abuse of discretion, *Uncommon, LLC*, 926 F.3d at 417.

Under Rule 26(g)(1), an attorney must sign "every discovery request, response, or objection." This signature certifies that, "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the response is, among other things, "complete and correct as of the time it is made." Fed. R. Civ. P. 26(g)(1)(A). "If a certification violates this rule *without substantial justification*, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3) (emphasis added). Thus, once a district court concludes that conduct violates Rule 26(g)(1), it has "discretion over the nature of the sanction but not whether to impose one." *Rojas v. Town of Cicero*, 775 F.3d 906, 909 (7th Cir. 2015).

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) [required disclosures] or (e) [supplementing disclosures], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*." (emphasis added). In addition to not being allowed to use the information, "the court, on motion and after giving an opportunity to be heard," may impose other sanctions. Fed. R. Civ. P. 37(c)(1).

As to the bodycam footage, the district court acknowledged Rittorno's testimony that she told defense counsel Dory at the beginning of Neita's civil suit that the footage existed. The court also noted Defendants' production of the footage came after Neita's motion for partial summary judgment and Neita's deposition. Nonetheless, the court found no basis to impose sanctions because the production took place within the extended discovery deadlines and before Defendants' summary judgment motion. We take this to mean the court viewed the delay in production as harmless, a plausible basis on which to reject the imposition of sanctions under Rule 37(c)(1). *See Uncommon, LLC*, 926 F.3d at 419 ("Rule 37, however, provides recourse for parties actually harmed by a litigant's noncompliance with disclosure obligations. It does not safeguard a party's decision to sense an error, seize on it, and then, when it is resolved, claim incurable harm in the face of apparent remedies. Litigation is adversarial, not a game of gotcha."). The district court also seemed to credit defense counsel's explanation that this footage "ha[d] recently come to Defendants['] attention." Although the district court opinion does not squarely address the contradiction between Dory's email and Rittorno's testimony, the court was in a much better position to make a credibility determination, especially where it had already found there was a "genuine issue about Rittorno's credibility." *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004) ("A court does not abuse its discretion unless ... (1) the record contains no evidence upon which the court could have rationally based its decision ...."). As such, we find no abuse of discretion in the court's decision to decline sanctions for the bodycam footage production under either rule.

As to the probable cause evidence, the district court also found no basis on which to grant Neita's request for sanctions. Based on our finding above—that the district court was within its discretion to not treat Defendants' amended answer as precluding additional grounds for probable cause emerging from the record, and to allow Rittorno's affidavit—we see no reason to undo that decision either.

### III. Qualified Immunity

We now turn to the core of the officers' defense at summary judgment: qualified immunity. We review the district court's decision to grant summary judgment on this basis de novo, examining the facts in a light most favorable to Neita as the nonmoving party. *Pryor v. Corrigan*, 124 F.4th 475, 486, 488 (7th Cir. 2024).

Under Section 1983, if a public official violates a person's constitutional rights, that person can sue the public official in their individual capacity. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). In turn, the public official may raise a qualified immunity defense. *City of Tahlequah v. Bond*, 595 U.S. 9, 11–12 (2021). Once raised, the burden shifts to the plaintiff to show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) [hereinafter *al-Kidd*] (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

We conclude Neita had a clearly established right to remain at liberty if the officers who conducted an investigation pursuant to an anonymous tip did not have evidence that Neita violated the Illinois Humane Care for Animals Act. We also conclude that genuine issues of material fact remain from

which a jury could determine that Defendants violated Neita's clearly established right by arresting him and seizing Macy. Recall, the officers arrived at Neita's property to determine *whether* there were any grounds to impound Neita's dog based on an anonymous tip describing inhumane treatment. That tip alone did not afford the officers probable cause to arrest. Taking the facts in the light most favorable to Neita, a reasonable jury could conclude a reasonable officer would not have believed (not even by mistake) that Neita was neglecting his duties as Macy's owner or abusing her. Thus, Defendants cannot enjoy qualified immunity at this stage of the case. We unpack all of this below.

### A. Clearly Established Law

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)); *see also Sabo*, 128 F.4th at 843–44. "[T]o clearly establish a right, existing precedent must place the constitutional or statutory question 'beyond debate.'" *Sabo*, 128 F.4th at 844 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). Plaintiffs can meet this burden by presenting "a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." *Leiser v. Kloth*, 933 F.3d 696, 701–02 (7th Cir. 2019) (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)). Although specificity matters in the Fourth Amendment context, our analysis of the clearly established right must draw a careful balance to avoid an inquiry that is "too general" or "too specific." *Id.* at 702; *see also Rivas-Villegas*, 595 U.S. at 6 (noting the importance of the specificity

requirement); *Sabo*, 128 F.4th at 844 (noting the caselaw presented did not need to be directly on point); *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (explaining that an analogous case need not be on point "on all fours with the defendant officer's misconduct" (citation modified)); *al-Kidd*, 563 U.S. at 742 (finding that the proposition that an unreasonable search or seizure violates the Fourth Amendment was too general). As such, "'the crucial question' at the core of any qualified immunity analysis [is] 'whether the official acted reasonably in the particular circumstances that he or she faced.'" *Sabo*, 128 F.4th at 844 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

It is clearly established law that where officers receive an anonymous tip about a suspected crime and pursue an investigation, but that investigation does not yield evidence that a crime has been committed, there is no probable cause to arrest. *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). *See also Dunaway v. New York*, 442 U.S. 200, 214 (1979) (noting that "centuries of precedent" undergird "the principle that seizures are 'reasonable' only if supported by probable cause"); *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018); *Bailey v. United States*, 568 U.S. 186, 192 (2013); *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *United States v. Watson*, 423 U.S. 411, 423–24 (1976); *Draper v. United States*, 358 U.S. 307, 310 (1959). Additionally, as relevant here, because probable cause makes a warrantless arrest reasonable under the Fourth Amendment, *Michigan*, 443 U.S. at 36; *see also Watson*, 423 U.S. at 423–24, its existence "is an absolute defense to a § 1983 claim for false arrest." *Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013).

To arrive at probable cause, officers relying on a tip that a crime has occurred ought to "corroborat[e] [the] details of [the] informant's tip by independent police work." *Illinois v. Gates*, 462 U.S. 213, 241 (1983). For example, in *Draper*, a narcotics informant tipped off an officer that a man would be transporting heroin by train on one of two days. 358 U.S. at 309. The tip provided information about what the man looked like, what he would be wearing and carrying ("a tan zipper bag"), and that the man "habitually 'walked real fast.'" *Id.* The Supreme Court held that the officer had probable cause to arrest because the officer "had personally verified every facet of the information given him" except for the possession of heroin and thus had enough grounds to believe that the remaining unverified information—that the arrestee had committed the drug crime—was likely true. *Id.* at 313.

Inherent in officers' duty to ascertain probable cause before an arrest is the principle that they "may not close [their] eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when ... it is unclear whether a crime ha[s] even taken place." *BeVier*, 806 F.2d at 128. It is not until officers "establish[] cause on every element of the crime" that they may stop investigating leads or testing the suspect's claim of innocence. *Id.* (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 437–442 (7th Cir. 1986)). Where "the arrest could have been avoided if the arresting officer had conducted a proper investigation, summary judgment [is] improper." *Id.* at 127 (citing *Moore v. The Marketplace Rest.*, 754 F.2d 1336, 1345–46 (7th Cir.1985)).

*BeVier* involved the arrest of two parents for child neglect. *Id.* at 125–27. Before the arrest, the officer did not ask any

questions of the parents, the babysitter who was watching the two young children at the time of the arrest, or hospital personnel who had recently treated the children. *Id.* Had the officer posed a few questions to the sources available to him, he would have discovered the parents were caring for their children and had instructed the babysitter to do the same. *Id.* at 127. Because the child neglect statute had an intent requirement, and there was no evidence of intent, we found the officers' failure to make further inquiries was an unreasonable mistake that led the officers to arrest the parents without probable cause. *Id.* at 128–29 (finding also that the officers were not entitled to "good faith immunity").

Defendants try to distinguish *BeVier* because the Illinois Humane Care for Animals Act, unlike the child neglect statute in *BeVier*, does not impose an intent requirement. But this framing overlooks our guidance that analogous cases need not be "too specific" or compare "on all fours." *See Leiser*, 933 F.3d at 702. As in *BeVier*, the issue is whether a reasonable officer could have arrested Neita (and thereafter seized Macy) absent evidence that any of the elements of the Act had been violated (i.e. had probable cause). The fact that the Act has no intent element does not preclude us from relying on *BeVier* as clearly established law that a tip alone may not suffice, and officers must independently corroborate the tip to have probable cause to arrest. This is especially true where the elements of the relevant crime the officers were investigating were unambiguous. As Neita notes, at the time of his arrest, a state appeals court had already held that the Act's plain and ordinary meaning provided law enforcement officers "with explicit standards to apply the law in a nondiscriminatory manner." *People v. Curtis*, 944 N.E.2d 806 (Ill. App. Ct. 2011).

## B.  Violation of Clearly Established Law

Genuine issues remain as to whether Defendants violated Neita's clearly established right by arresting him following an investigation that did not produce evidence that any element of the criminal act at issue—the Illinois Humane Care for Animals Act—had been violated. In other words, this case presents a genuine issue about whether the officers had probable cause or, as we explain below, arguable probable cause. Consequently, the officers are unable to avail themselves of the shield that is qualified immunity.

"[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan*, 443 U.S. at 37 (citation modified). This entails a practical, commonsense, and nontechnical standard which requires only determining "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). "Although our focus is on what the officer knew at the time of the arrest, we must determine whether those facts and circumstances, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Abbott*, 705 F.3d at 714 (citation modified) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Qualified immunity shields officers who have probable cause to arrest—and also arguable probable cause to arrest. *Abbott*, 705 F.3d at 714–15; *see also District of Columbia*, 583 U.S.

at 65. Arguable probable cause is different from probable cause in that it applies where officers had a reasonable *but mistaken* belief that probable cause existed. *Abbott*, 705 F.3d at 714–15; *District of Columbia*, 583 U.S. at 65. In other words, arguable probable cause exists when "a reasonable police officer in the same circumstances and … possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Fleming v. Livingston County*, 674 F.3d 874, 880 (7th Cir. 2012) (citation omitted).

Neita argues Defendants did not observe *any* evidence indicating animal abuse or neglect before arresting him, and they therefore lacked even arguable probable cause. We agree that, from the officers' inadequate investigation genuine and material issues of fact remain about the existence of even arguable probable cause. As such, granting summary judgment on the basis of qualified immunity was improper. *See BeVier*, 806 F.2d at 128–29. At the direction of ACC, the officers were there to ascertain whether there were grounds to impound Macy. The anonymous tip provided the grounds for an investigation; it did not supply the probable cause needed for an arrest. To explain, and because probable cause and arguable probable cause both depend on the elements of the predicate offense, we revisit the criminal law at issue. *See Abbott*, 705 F.3d at 715.

The officers arrested Neita pursuant to two sections of the Illinois Humane Care for Animals Act: 510 ILCS 70/3, relating to owner's duties, and 510 ILCS 70/3.01, relating to cruel treatment. Under 510 ILCS 70/3:

> (a) Each owner shall provide for each of his or
> her animals:

(1) a sufficient quantity of good quality, wholesome food and water;

(2) adequate shelter and protection from the weather;

… and

(4) humane care and treatment.

(b) To lawfully tether a dog outdoors, an owner must ensure that the dog:

…

(5) is tethered with a properly fitting harness or collar other than the lead or a pinch, prong, or choke-type collar; …

Under 510 ILCS 70/3.01:

(a) No person or owner may beat, cruelly treat, torment, starve, overwork or otherwise abuse any animal.

(b) No owner may abandon any animal where it may become a public charge or may suffer injury, hunger or exposure.

(c) No owner of a dog or cat that is a companion animal[5] may expose the dog or cat in a manner that places the dog or cat in a life-threatening

---

[5] The Act defines "companion animal" as "an animal that is commonly considered to be, or is considered by the owner to be, a pet." 510 ILCS 70/2.01a.

situation for a prolonged period of time in ex-
treme heat or cold conditions that:

> (1) results in injury to or death of the an-
> imal; or

> (2) results in hypothermia, hyperther-
> mia, frostbite, or similar condition as di-
> agnosed by a doctor of veterinary medi-
> cine.

Defendants offer several grounds on which to find they
had probable cause to arrest Neita for violations of the Act. At
this stage, however, they do not prevail on any of the
grounds.

First, Defendants argue probable cause existed to arrest
Neita for failure to provide Macy with food and water. For
support, Defendants point to their investigation, which did
not reveal any food or water on the property. Neita argues
that Defendants ignore the Act's requirement for "sufficient"
food and water, which a reasonable person could not have as-
certained by visiting the property for about twenty minutes.

We agree with Neita's position, based on the "totality of
the facts and circumstances" known to the officers at the time.
*Abbott*, 705 F.3d at 714. Even if Macy's food bowl was empty
when the officers arrived, there were several indications from
the investigation that she received sufficient food. For one, the
photos and bodycam footage show Macy was a robust and
muscular dog. This is not a case where officers observed a
skinny, emaciated dog. *See, e.g.*, *People v. Collier*, 2020 IL App
(1st) 162519, ¶ 6 (finding enough evidence to support a con-
viction under the Act where officers found several dogs who

appeared skinny and unfed in a home without any food). Additionally, bodycam footage shows Macy was a playful and active dog. Although the officers presented different accounts of Macy's playfulness, our analysis focuses on what an objective, reasonable officer would infer from what was known at the time of the arrest. *See Devenpeck*, 543 U.S. at 152; *Maryland*, 540 U.S. at 371. Further, based on the limited minutes of investigation, no reasonable officer could rule out that Macy ate that morning and simply finished her meal by the time the officers arrived (as borne out by Neita's deposition testimony). Alternatively, Macy's feeding schedule could have been later in the day. Approximately twenty minutes at the property was just not enough time to ascertain whether a robust, muscular dog had sufficient food.[6] The officers, in fact, seemed to concede this when they testified that Macy appeared in good health and that they did not know the last time she had been fed or how long she had been outside.

As for Macy's access to water, the parties disagree on whether Macy's bowl was empty (Neita's position) or had frozen water in it (Defendants' position). Since the photos and the reports in the record do not shed much light here, this is a genuine, disputed, material fact. Setting aside this disputed fact, at some point during the investigation, the officers at the scene did observe Macy urinating. As Rittorno conceded, and as a reasonable officer would understand, urination signals

---

[6] Even if, as Defendants argue, the officers looked around the entire property and found no dog food, they could have easily discovered whether Macy had eaten that day, or what and when she regularly ate, by asking Neita directly. The absence of dog food out in the open on Neita's lot, without any other indication that Macy was underweight or underfed, could not by itself serve as basis to find a violation of the Act.

recent consumption of water. All told, these observations, during an investigation that spanned about twenty minutes, could not have formed the basis for a reasonable officer to conclude, even by mistake, that Macy did not have access to "a sufficient quantity" of food and water.[7]

Second, Defendants argue probable cause existed because Neita failed to provide his dog "adequate shelter and protection from the weather." Defendants maintain the officers observed a short-haired dog without much fur; the dog was unattended (and according to the anonymous report, left alone every day, all day); the only shelter available was a makeshift plywood structure that lacked insulation and was not elevated two inches off the ground; and, despite the heater, frost had accumulated inside the house.

Even if Macy's house was not the most polished, a reasonable jury could find it offered her adequate shelter and protection from the outdoors. To be clear, the Act does not require owners to provide padding and a two-inch clearance from the ground. Still, there is a genuine dispute as to whether there was some padding that could further insulate Macy from the cold. Officer Rittorno testified she observed no

---

[7] Defendants have never argued that a frozen water bowl signaled that Macy did not have access to sufficient water. Even if they had, there remains a genuine dispute about whether there was ice in Macy's water bowl. Here again, we would not be faced with so much uncertainty had the officers conducted a reasonable investigation. They did not ask Neita anything about Macy's access to water and they did not note anything contemporaneously, or later in their reports and charges, about a frozen water bowl. We are left with after-the-fact officer testimony contradicted by Neita's testimony that Macy's bowls were empty. At this stage, this evidence is insufficient to support a mistaken belief about probable cause to arrest Neita for offering his dog insufficient access to water.

padding besides the flattened cardboard box on the floor. But she did not look or photograph beneath the cardboard. Nor did Graffeo's bodycam footage record the inside of Macy's house. Neita maintains that between the plywood floor and the cardboard box, Macy had additional padding. For support, he offered a photo taken after the fact in which he lifts the cardboard to reveal the padding. This creates yet another genuine issue as to the presence of padding, something an officer could have easily ascertained by lifting the cardboard. *See BeVier*, 806 F.2d at 128 ("A police officer may not close [their] eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").

Genuine issues also exist as to whether a reasonable officer could have concluded the heater was adequate. Rittorno and Enriquez did not initially document—in their arrest report, supplemental arrest report, or charging documents—that they had observed a bowl with freezing water. Although there are photographs of the inside of Macy's house, it is hard to tell from these whether the bowl was empty or contained ice. The photos also do not depict the amount of frost that Enriquez and Rittorno described in their depositions; only a small trail of snow can be seen at the entrance of Macy's house. The photos clearly show that Macy's house was not covered with the same amount of snow as the lot's vehicles. This could mean Neita made sure to remove any excess snow, thereby ensuring it did not seep into Macy's house. It could also demonstrate the heater's adequacy in melting away the snow. In any event, a reasonable officer would have taken these observations to mean someone was caring for Macy that cold day. Alternatively, if in doubt, having already seen that

Macy had a working heater, the officers could have easily in-spected the heater more closely. A jury could reasonably con-clude that a trail of snow at the entrance of Macy's house would not be enough to signal, not even by mistake, the heater was not warming Macy enough.

Third, Defendants argue probable cause to arrest existed because Neita unlawfully tethered Macy outdoors with a "choke-type collar," in violation of the Act. 510 ILCS 70/3(b)(5). The Act does not define "choke-type collar," but the parties seem to agree it is a type of collar, sometimes made of chain material, that tightens around a dog's neck when the end of the chain is pulled. The use of this type of collar was not one of the officers' initial concerns when it came to Macy's care. Enriquez initially expressed a concern that Neita was us-ing two leashes to tether Macy to a bumper truck—a concern that Defendants have not argued supplied probable cause to arrest Neita. It was only at the summary judgment phase that Defendants claimed Neita had Macy in a "choke-type collar."[8]

The record contains several photos and bodycam footage of Macy where her collar is partially visible. Her collar is made of a chain-like material that extends several links

---

[8] Neita takes issue with the fact that Defendants did not assert the us-age of a "choke-type collar" as a basis for probable cause until summary judgment. As explained above, our assessment of probable cause can rely on conclusions an arresting officer reasonably could have drawn from the information known to the officer. *Holmes*, 511 F.3d at 679. These conclu-sions can be different from the subjective observations Rittorno and En-riquez did in fact rely on. *See id.* However, Neita correctly points out that there is no testimony to support the claim that Macy was wearing a choke-type collar, nor do the officers' subsequent reports and charges mention anything about Macy wearing a choke-type collar. Thus, our review is confined to the photos and bodycam footage in the record.

beyond her neck before ending in a metal ring into which her leash's snap hook attaches. A reasonable officer, particularly one assigned to animal care investigations, would understand that not all chain collars are choke-type collars. So, even assuming the officers observed chain-like material around Macy's neck, that would not conclude an inquiry into whether she was wearing a choke-type collar. In fact, if it was unclear what type of collar she was wearing, a reasonable investigative step to ascertain probable cause would have been to check Macy's collar to see if it had a choking mechanism (i.e., whether the collar itself tightened around Macy's neck every time Macy pulled on the leash). *BeVier*, 806 F.2d at 128 (declining to find arguable probable cause where the officer "had acted unreasonably in failing to make further inquiries"). There are also no indications from the bodycam footage, nor do Defendants argue as much, that the collar was tightening every time Macy pulled Enriquez's lead—a feature of choke collars. Here again, because a genuine issue remains about what type of collar Macy was wearing, it fails to carry the day for Defendants' probable cause argument at this stage of the case.

Defendants would have us conclude that a reasonable officer could have been mistaken (for purposes of arguable probable cause) about the type of collar. Not so on the record before us. This is not a case where the officers reasonably investigated the evidence before them and mistakenly came to the incorrect, yet reasonable conclusion that Macy was wearing a choke-type collar. Here, the officers' investigation was so lacking that the trier of fact is left to decipher from photos and footage a feature which required closer in-person examination.

Fourth, Defendants argue probable cause existed because Macy looked like she had been abandoned on a lot without any permanent structures, and a graffiti-covered shipping container. The state of property may be relevant to the way an animal is being treated. For example, in *People v. Collier*, officers recovered dogs from rooms containing "piles of feces, including a second-floor bathtub that was filled with feces." 2020 IL App (1st) 162519 ¶ 5. But observations about Neita's property we have already addressed (for example, the functioning heater, which would require that someone turn it on and pay for the electricity to run it) alter the impact the graffiti and parked vehicles would have had on a reasonable officer.

Even more importantly, despite Defendants' assertion that the property was an abandoned lot, there were at least two indicators from which a reasonable officer could infer it was not abandoned. One, the anonymous tip claimed that Neita was *living* in a camper on the lot. The bodycam footage confirms that the camper was visible as soon as the officers entered the property. Two, Neita testified that he explained to the officers that Macy was his dog *and* the lot was his property. These indicators would have clarified the situation for any reasonable officer, especially since officers are expected to update the inferences they can draw from an anonymous tip based on information obtained during an investigation. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568–69 (1971) (holding that the petitioner's arrest violated his Fourth Amendment rights because the arresting officer did not "possess[] … any factual data tending to corroborate the informer's tip"); *Draper*, 358 U.S. at 309, 313 (officer "personally verified every facet of the information" from an informant's tip, except for the possession of heroin, lending credence to the informant's allegation that a crime had been

committed). In other words, an anonymous tip standing alone does not supply the necessary probable cause for an arrest; officers must corroborate the tip, in this case, through their investigation. Upon learning that Neita owned Macy and the lot, a reasonable officer would have inquired about Neita and Macy's current living situation. Had the officers done this, they may have learned, as Neita testified, that they were both temporarily living at a neighbor's home and Neita had placed Macy on the lot briefly as he attended to some work inside another neighbor's house. But the officers did not seem to address any of these questions with Neita, a source of information readily available to them. *See BeVier*, 806 F.2d at 127 ("[The officer] had merely to ask any of several individuals at the scene.").

In sum, although the officers arrived at Neita's property at the behest of ACC's anonymous tip, that tip was not a substitute for the probable cause needed for his arrest. Clearly established law obligated any reasonable officer to verify the information from an anonymous tip where the question of whether Neita had violated the law remained unclear. That duty to investigate would have ceased once the officers had probable cause to arrest.

Given the genuine issues of fact detailed above, Defendants cannot at this stage succeed with their qualified immunity defense. This revives Neita's claims of false arrest and illegal search and seizure (Counts I and II).[9] In turn, Neita's false

---

[9] Because the only basis for seizing Macy was a violation of the Act, the same analysis of probable or arguable probable cause as to Neita's arrest also applies to the unreasonable seizure of Macy. *See* 510 ILCS 70/3.04 ("Any law enforcement officer making an arrest for an offense involving one or more companion animals under Section 3.01 ... of this Act may

arrest and illegal seizure claims offer the necessary underlying constitutional violation to revive his derivative claims of conspiracy to deprive of constitutional rights and failure to intervene (Counts IV and VI). *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation ...."). And, with jurisdiction over Neita's federal claim, the district court may choose to retain supplemental jurisdiction over Neita's state claims for indemnification and malicious prosecution (Counts VII and VIII). *See* 28 U.S.C. § 1367.

## IV. Malicious Prosecution

Neita's last challenge is to the district court's dismissal of his federal claim of malicious prosecution (Count III). We conclude that dismissal was proper and take this opportunity to clarify the contours of a federal malicious prosecution claim.

We review a district court's dismissal for failure to state a claim de novo, accepting as true all well-pled facts in the complaint and drawing all reasonable inferences in the plaintiff's favor. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 881 (7th Cir. 2022).

The district court dismissed this claim, noting:

> As distinct from a claim of unlawful detention, there is no right of action for malicious prosecution based on the Fourth Amendment. *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) ("There is no such thing as a constitutional right

---

lawfully take possession of some or all of the companion animals in the possession of the person arrested.").

not to be prosecuted without probable cause")
(quoting *Serino v. Hensley*, 735 F.3d 588, 593 (7th
Cir. 2013)); *see also Myers v. Bresnahan*, No. 18 C
8312, 2019 WL 2450489, at *2 (N.D. Ill. June 12,
2019). The point of these cases, as it relates to
Neita, is that his remedy for the alleged Fourth
Amendment violations he suffered are the false-
arrest and illegal-search-and-seizure claims he
raised above. *See Serino*, 735 F.3d at 594. Count
III is dismissed.

*Neita v. City of Chicago*, No. 19 C 595, 2019 WL 5682838, at *4
(N.D. Ill. Nov. 1, 2019) (footnote omitted).

The district court cited our 2018 decision in *Manuel*. To un-
derstand our holding in that case, it is helpful to take one step
back to the Supreme Court's review of the case in 2017, before
we received it again on remand. The Court held that Manuel,
who had been arrested and whose detention continued after
a judge's finding of probable cause, could assert a Fourth
Amendment claim both for his "(pre-legal-process) arrest"
and his "(post-legal-process) pretrial detention." *Manuel v.
City of Joliet*, 580 U.S. 357, 359–62, 368 (2017). The Court, how-
ever, did not address the secondary issue of whether, if the
"Fourth Amendment right to be free from unreasonable sei-
zure continues beyond legal process," this would "allow a
malicious prosecution claim." *Id.* at 372 n.10. On remand, we
interpreted this to mean that a "Fourth Amendment mali-
cious prosecution is the wrong characterization. There is only
a Fourth Amendment claim—the absence of probable cause
that would justify the detention." *Manuel v. City of Joliet*, 903
F.3d 667, 670 (7th Cir. 2018), *cert. denied* 139 S. Ct. 2777 (2019)
(citation modified). The Supreme Court has since taken up a

case involving "a Fourth Amendment claim under 42 U.S.C. § 1983 for malicious prosecution," recognizing the possibility of asserting such a claim. *See Thompson v. Clark*, 596 U.S. 36, 39 (2022).

With this recent guidance in mind, we turn to the elements of a federal malicious prosecution claim. To determine the elements of a constitutional claim under § 1983, we "first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted." *Thompson*, 596 U.S. at 43. The most analogous tort here is the tort of malicious prosecution. *Id.* The elements of the malicious prosecution tort are:

> (i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution terminated in the acquittal or discharge of the accused.

*Id.* at 44 (citation modified) (citing T. Cooley, Law of Torts 181 (1880)). "Because this claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." *Id.* at 43 n.2.[10]

After reviewing Neita's complaint de novo, we find that he has failed to properly plead his Fourth Amendment claim

---

[10] The Supreme Court in *Thompson* speculated that, by contrast, a plaintiff "presumably would not have to prove that he was seized as a result of the malicious prosecution" were he to assert a § 1983 malicious prosecution claim under the Due Process Clause. 596 U.S. at 43 n.2. As was the case in *Thompson*, that is not a claim before us and so "we have no occasion to consider such an argument here" either. *Id.*

for malicious prosecution. In his complaint, Neita alleged he was "arrested and imprisoned without probable cause." He also alleged his prosecution "was maliciously pursued" based on a previous civil rights action he filed against the City, several officers, and ACC's then director, for wrongful arrest and prosecution, which settled in 2017. He also alleged that the criminal proceedings against him resulted in a directed finding in his favor. What is not clear from the complaint is whether the malicious prosecution "resulted in [his] seizure." *Thompson*, 596 U.S. at 43 n.2. In other words, as Defendants point out, it is not clear whether Neita was detained after "legal process," which was, at the very least, after criminal charges were filed against him on February 8th. Neita simply alleges he was "unlawfully arrested and unlawfully charged." Although the Supreme Court has recognized a Fourth Amendment claim for a "(pre-legal-process) arrest" (i.e., a false arrest), *Manuel*, 580 U.S. at 368, it is unclear if such an arrest can form the basis of a Fourth Amendment claim of malicious prosecution, *see Thompson*, 596 U.S. at 42 n.1 (declining to consider "a Fourth Amendment claim for unreasonable seizure (labeled a false arrest claim), based on [the plaintiff's] initial arrest before charges were filed" because a jury had ruled against Thompson on that claim).

Neita seems to argue that his having to post bond, appear in court to defend himself, and endure the loss of his pet entitles him to raise an unreasonable seizure claim. But he does not otherwise offer any legal support that these consequences plausibly alleged that "the malicious prosecution resulted *in a seizure of the plaintiff*." *See Thompson*, 596 U.S. at 43 n.2 (emphasis added). He also does not point to any evidence on the record that he was, in fact, detained even after the commencement of legal process. Thus, although recent Supreme Court

guidance has confirmed the possibility of asserting Fourth Amendment malicious prosecution claims, Neita's complaint does not meet the pleading standard.

## V. Conclusion

For these reasons, we reverse only the grant of summary judgment to the Defendants based on qualified immunity. This revives Neita's claims of false arrest and illegal search and seizure (Counts I and II); his derivative claims of conspiracy to deprive of constitutional rights and failure to intervene (Counts IV and VI); and his claims for indemnification and malicious prosecution (Counts VII and VIII), over which the district court may choose to retain supplemental jurisdiction. We affirm the district court's discovery rulings and its dismissal of Neita's federal malicious prosecution claim (Count III).

AFFIRMED IN PART;

REVERSED AND REMANDED IN PART.

ST. EVE, *Circuit Judge*, dissenting in part. I join the majority's opinion regarding the discovery matters and the malicious prosecution claim. I respectfully dissent as to the majority's qualified immunity ruling. Officers Rittorno and Enriquez asserted a qualified immunity defense against Vaughn Neita's claims. To overcome that defense, Neita had to show that the officers violated a right that was "clearly established" at the time of the arrest. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Because he has not done so, I would affirm the district court's decision to grant summary judgment in favor of the officers.

Qualified immunity shields government officials from personal liability unless they violate clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The law must be so clear, in fact, that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Although the plaintiff need not point to a factually identical case, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (emphasis added) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

Neita argues that his arrest for violating the Illinois Humane Care for Animals Act was unlawful because the officers lacked probable cause. The majority denies the officers qualified immunity for this arrest based on various articulations of "clearly established law," including 1) "a clearly established right to remain at liberty if the officers who conducted an investigation pursuant to an anonymous tip did not have evidence that Neita violated the Illinois Humane Care for

Animals Act"; 2) "clearly established law that where officers receive an anonymous tip about a suspected crime and pursue an investigation, but that investigation does not yield evidence that a crime has been committed, there is no probable cause to arrest"; and 3) "[c]learly established law [that] obligated any reasonable officer to verify the information from an anonymous tip where the question of whether Neita had violated the law remained unclear." These various statements are different articulations of the clearly established law that arresting officers must have probable cause to justify the arrest of a person suspected of a crime.

Yet the Supreme Court has persistently cautioned courts against "defin[ing] clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). Instead, we must focus on the facts to assess "whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *see also Wesby*, 583 U.S. at 63 ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (citation modified)). This principle applies with particular force in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation modified).

So as we have "repeatedly told litigants," assertions that it is clearly established that arrests absent probable cause violate the Fourth Amendment are made "at an impermissibly high level of generality for qualified immunity purposes." *Jump v. Village of Shorewood*, 42 F.4th 782, 792 (7th Cir. 2022).

Rather, plaintiffs must identify precedent "where an officer acting under similar circumstances … was held to have violated the Fourth Amendment." *Wesby*, 583 U.S. at 64; *see also Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015) (explaining that plaintiffs must "demonstrate that it was clearly established that probable cause was lacking in the circumstances presented").

Neita has not identified a closely analogous case. The majority relies on *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986), to find otherwise, but *BeVier* presented plainly different circumstances.[1]

In *BeVier*, we addressed an arrest for knowing and willful child neglect, which required a showing of intent. The law enforcement officer in *BeVier* did not have any evidence of intent. To the contrary, the officer had evidence that the children's parents attempted to remedy their situation, yet he failed to pursue "at least four sources of information available" that could have shed light on whether a crime had even

---

[1] The majority notes that "[c]learly established law obligated any reasonable officer to verify the information from an anonymous tip where the question of whether Neita had violated the law remained unclear." To the extent the majority extrapolates from *BeVier* a standalone right to any particular level of investigation, *BeVier* does not establish any such right. *See Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 525 (7th Cir. 2001) (rejecting the plaintiff's argument that "*BeVier* requires police officers to conduct independent investigations before making an arrest" beyond that required to establish probable cause); *Stokes v. Bd. of Educ. of Chi.*, 599 F.3d 617, 625 (7th Cir. 2010) ("In some situations, an officer may be required to conduct some investigation before making an arrest; in others, an officer may have probable cause for arrest without any need for investigation.").

taken place. *BeVier*, 806 F.2d at 128–29. An experienced Department of Child and Family Services investigator also informed the officer that the description of the children's situation did not appear to establish neglect. *Id.* at 128. Unlike in *BeVier*, and as the majority acknowledges, the Illinois Humane Care for Animals Act does not impose an intent requirement. And there was not a comparable failure to corroborate the anonymous tip by the officers here.

Because both the statute and the facts in *BeVier* are markedly different from those here, we cannot expect a reasonable officer to analogize from one case to the other. In other words, *BeVier* does not put the question of probable cause "beyond debate" under these circumstances. *Kisela*, 584 U.S. at 104. Nor does *Draper v. United States*, 358 U.S. 307, 310 (1959), help. It merely reaffirms the principle that officers must have probable cause to arrest someone.

Neita does, of course, have a right to be free from arrest absent probable cause. For qualified immunity purposes, however, arguable probable cause suffices. *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021). "Arguable probable cause is established when a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648, 656 (7th Cir. 2024). "[A]s long as the officers reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest …, then they are entitled to qualified immunity." *Cibulka*, 992 F.3d at 638. Whether arguable probable cause exists presents "a pure question of law" for courts to decide. *Id.* at 639 n.2.

Officers Rittorno and Enriquez came to the property to investigate anonymous complaints that a dog was being kept in inhumane conditions without food, water, or adequate shelter. That day, there were several inches of snow on the ground; the temperature was 19 degrees Fahrenheit with a windchill of 7 degrees. When officers arrived, they found Macy alone and tied to the bumper of a truck. Next to the truck sat a ply-wood doghouse with an electric heater inside. The parties dispute the heater's efficacy, but video and photographic evidence show snow and ice had accumulated on parts of the doghouse roof and exterior (though not as much snow as on the vehicles parked in the vacant lot). There was no food in Macy's bowl, and evidence suggests that any water in her bowl was frozen. The interior of the doghouse was bare, although there was cardboard and what appears to be a Styrofoam pad on the floor. Photo and video evidence also show that Macy had a chain-like collar around her neck.

The anonymous complaints, combined with the officers' corroboration that Macy had been left alone for an uncertain amount of time without food or drinkable water in extremely cold and wet conditions, was enough for at least arguable probable cause that Neita had violated the Illinois Humane Care for Animals Act.

For these reasons and because the majority has not identified any closely analogous case putting every reasonable officer on notice of a violation, I would affirm the district court's decision to grant summary judgment for defendants on Neita's unlawful seizure and retaliatory arrest claims.